893 P.2d 168

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**Alai M. ALULI, Defendant–Appellant.**

**No. 17347.**

Supreme Court of Hawai'i.

April 12, 1995.

**318**

Hayden Aluli, Honolulu, for defendant-appellant.

Mark R. Simonds, Deputy Pros. Atty., Wailuku, for plaintiff-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

NAKAYAMA, Justice.

Defendant-appellant Alai M. Aluli appeals her conviction of promoting a dangerous drug in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 712–1242(1)(c). Aluli primarily argues that she did not "distribute" cocaine because she merely offered to buy cocaine and an offer to buy does not, as a matter of law, constitute an act of "distribution." We reverse.

## I. BACKGROUND

On August 8, 1992, at approximately 9:30 p.m., Sergeant Keith Kawano of the Maui County Police Department was riding his bicycle to work on the island of Moloka'i dressed in a T-shirt and shorts, when he saw a van traveling west-bound on Kamehameha V Highway pull onto the shoulder and stop. After Kawano had pedaled past the van some twenty-five to thirty yards, the driver, Aluli, called out to him for assistance. Kawano rode back to the van, where Aluli said to him, "Oh, I need a G." Kawano, who had prior experience in drug arrests and understood drug jargon, took the request to mean that Aluli wanted a gram of some drug. Never-

theless, he asked Aluli what she meant. She responded, "A gram, a gram of coke." Kawano told Aluli that he could not help her. Aluli repeated her request and offered Kawano one hundred dollars. Kawano then told Aluli that he would see what he could do and to wait for him at the Moloka'i Drive–Inn (the drive-in). Kawano left without taking the offered money and pedaled to the police station.

At the station, Kawano told Sergeant Timothy Meyer and Lieutenant Robert Ribao about his encounter with Aluli. The three decided to execute a "reverse drug buy," in which Kawano would sell fake cocaine to Aluli. Ribao concocted a mixture of coffee creamer and sugar to simulate cocaine and sealed the mixture in a plastic bag. The three officers then left for the drive-in, Kawano on his bicycle.

When they arrived at the drive-in, Kawano saw Aluli, who signaled him over to her van. After seeing that his backup officers, Ribao and Meyer, were in place, Kawano rode to Aluli's van. Aluli held out a one hundred dollar bill and asked Kawano, "Did you get the coke? Did you get the coke?" Kawano responded that he had and handed her the packet of creamer and sugar. Aluli handed him the one hundred dollar bill. Kawano then signaled to Ribao and Meyer that the deal was done. Ribao and Meyer moved in and placed Aluli under arrest.

On November 2, 1992, a grand jury indicted Aluli on the charge of promoting a dangerous drug in the second degree, in violation of HRS § 712–1242(1)(c). HRS § 712–1242(1)(c) provides that "[a] person commits the offense of promoting a dangerous drug in the second degree if the person knowingly ... [d]istributes any dangerous drug in any amount."

On December 23, 1992, Aluli filed a motion to dismiss the indictment. She primarily argued that the evidence that the prosecutor presented to the grand jury simply showed that she offered to purchase cocaine from Kawano and that an offer to purchase did not constitute an act of "distribution." Rather, HRS § 712–1240 (1985) defines "[t]o distribute" to mean "to sell, transfer, prescribe, give, or deliver to another, or to leave, barter

or exchange with another, or to offer or agree to do the same." Because, Aluli argued, the legislature's definition of "to distribute" reflected an intention to proscribe the act of *providing* (or offering or agreeing to provide) dangerous drugs and not the act of *buying* (or offering or agreeing to buy), her offer to buy cocaine fell outside of the reach of the statute.

A hearing on the motion was held on January 6, 1993. At the conclusion of the hearing, the trial court denied the motion.

A jury trial commenced on June 7, 1993. Kawano, who was the prosecution's primary witness, testified to the events that are summarized above. The prosecution also called Meyer as a witness, and he essentially corroborated Kawano's version of the events that occurred after Kawano returned to the police station after his initial conversation with Aluli.

At the close of the prosecution's case, Aluli moved for a judgment of acquittal. She argued that, even viewing the evidence in the light most favorable to the prosecution, the prosecution had failed to prove that she distributed a dangerous drug, because HRS § 712–1242(1)(c) did not proscribe offers to buy cocaine. Aluli also argued that, even if it did, the prosecution had failed to prove that Aluli distributed cocaine because, by its own admission, the substance Kawano sold to Aluli did not contain cocaine. The trial court denied the motion.

After presenting a brief case, Aluli made another motion for a judgment of acquittal, asserting the same grounds as before. The trial court again denied the motion.

On June 8, 1993, the jury returned a verdict finding Aluli guilty of promoting a dangerous drug in the second degree.[1] On August 4, 1993, Aluli was sentenced to five years' probation. She filed a timely notice of appeal on August 5, 1993.

## II. *DISCUSSION*

On appeal, Aluli argues that the evidence presented to the grand jury and at trial

showed that she simply offered to buy cocaine from Kawano and that, as a matter of law, an offer to buy does not constitute an act of distribution under HRS § 712–1242(1)(c). She argues that "to buy" plainly falls outside HRS § 712–1240's definition of "to distribute." Aluli also claims that even if the statutory definition of "to distribute" were ambiguous, the ambiguity should be resolved in her favor because: (1) the general rule is that penal statutes should be strictly construed; and (2) the legislative history, statutory scheme and relevant case law indicate that "to distribute" does not mean "to buy." Finally, Aluli argues that, even if the legislature intended its definition of "to distribute" to include "to buy," the definition fails to convey that intention in terms an ordinary person would understand, rendering HRS § 712–1242(1)(c) unconstitutionally vague on its face and as applied.

Plaintiff-appellee State of Hawai'i (prosecution) does not respond directly to Aluli's argument that "to buy" or "to offer to buy" does not fall within the statutory definition of "to distribute." Instead, the State argues that this court has upheld convictions of promoting dangerous drugs in other cases where the defendants were caught in "reverse buys" or "reverse stings" (*i.e.,* the police sold drugs to, rather than bought from, the defendant) and, therefore, has implicitly held that buying or offering to buy dangerous drugs is proscribed under HRS § 712–1242(1)(c). It also argues that the cases upholding convictions of promoting dangerous drugs implicitly hold that HRS § 712–1242(1)(c) is not unconstitutionally vague.

a.

The central issue on appeal is whether one "distributes" a dangerous drug in violation of HRS § 712–1242(1)(c) when he/she buys or offers to buy cocaine. The answer to that question turns on whether "to buy" or "to offer to buy" falls within HRS § 712–1240's definition of "to distribute."

1. During the jury's deliberations, it asked the court the following question: "Does the offer to buy cocaine is [sic] considered promoting a dan-

gerous drug?" The court responded: "In response to the question the court's instructions will be provided to you."

"The construction of a statute is a question of law which this court reviews *de novo*." *Ross v. Stouffer Hotel Co. (Hawai'i) Ltd.*, 76 Hawai'i 454, 460, 879 P.2d 1037, 1043 (1994) (citing *Richardson v. City and County of Honolulu*, 76 Hawai'i 46, 63, 868 P.2d 1193, 1210, *reconsideration denied*, 76 Hawai'i 247, 871 P.2d 795 (1994)). When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statute itself. *Pacific Int'l Services Corp. v. Hurip*, 76 Hawai'i 209, 216, 873 P.2d 88, 95 (1994) (citations omitted). Where the language is plain and unambiguous, the court's sole duty is to give effect to its plain and obvious meaning. *Ross*, 76 Hawai'i at 461, 879 P.2d at 1044 (citing *AIG Hawaii Ins. Co. v. Estate of Caraang*, 74 Haw. 620, 633–34, 851 P.2d 321, 328 (1993)). Further, in interpreting a statute, we give the words their common meaning, unless there is something in the statute requiring a different interpretation. *Id.* (citing *Schmidt v. Board of Directors of Ass'n. of Apartment Owners of The Marco Polo Apartments*, 73 Haw. 526, 532, 836 P.2d 479, 482 (1992); *State v. Garcia*, 9 Haw.App. 325, 328, 839 P.2d 530, 532 (1992)); *see also* HRS § 1–14 (1985).

### b.

In our view, it would take Procrustes himself to fit "to buy" or "to offer to buy" into the statutory definition of "to distribute."

First, as we have noted, HRS § 712–1240 defines "to distribute" to mean "to sell, transfer, prescribe, give, or deliver to another, or to leave, barter, or exchange with another, or to offer or agree to do the same." Noticeably absent from the definition is "to buy" or any of its obvious synonyms, *e.g.*, "to purchase" or "to acquire." Because it would have been simple enough for the legislature to include "to buy" or its equivalent in the definition of "to distribute," its failure to do so is telling. Indeed, given that the legislature chose to include "to sell" in the definition, the omission of its converse indicates to us that the legislature did not intend "to distribute" to mean "to buy" or "to offer to buy."

Second, none of the words the legislature used to define "to distribute" suggest that it intended to include "to buy" in the definition. "Buy" means, *inter alia*, "to acquire the possession of, or the right to, by paying or promising to pay an equivalent, esp. in money; purchase. 2. to acquire by any kind of recompense[.]" *Random House College Dictionary* 184 (rev. ed. 1979). Thus, one who buys a thing acquires or obtains ownership of it *from* another. In contrast, virtually all of the words the legislature used to define "to distribute"—*e.g.*, "sell, transfer, prescribe, give, or deliver"—convey a sense of providing or relinquishing possession, control or ownership of a thing "*to* another." HRS § 712–1240 (emphasis added). That is not surprising given that "distribute" is ordinarily defined to mean, *inter alia*, "1. to divide and give out in shares; allot. 2. to disperse through a space or over an area; spread; scatter. 3. to sell, offer for sale, or deliver (an item or line of merchandise) to individual customers, esp. in a specified region or area." *Random House College Dictionary* 386 (rev. ed. 1979). It would distort the meaning of "to distribute," then, to use it interchangeably with "to buy." Although the two clearly are complements, insofar as one is the converse of the other, they are not synonyms.

The only language in HRS § 712–1240 that might, perhaps, suggest that the legislature intended to include "to buy" in its definition of "to distribute" is the "exchange with another" part of the definition. "Exchange" is defined to mean, *inter alia*, "1. to part with for some equivalent; give up (something) for something else. 2. to change for another; replace with something else. 3. to give and receive reciprocally; interchange[.]" *Random House College Dictionary* 460 (rev. ed. 1979). Thus, a person who exchanges something both gives the thing and accepts an equivalent in return. Because that general definition covers both sides of a transaction (*e.g.*, the sale and purchase), its inclusion in HRS § 712–1240 might suggest that the legislature intended "to distribute" to mean "to buy."

The inclusion of "exchange with another" in the definition of "to distribute," however, must be read in context. HRS 712–

1242(1)(c) makes it a crime for one to knowingly "[d]istribute[ ] any dangerous drug in any amount." Substituting "exchange with another" for "distribute," the statute makes it illegal to knowingly "[exchange] any dangerous drug [with another] in any amount." Read that way, the statute plainly requires that the actor provide a dangerous drug to another in return for which he/she receives some equivalent dangerous drug. For example, a person would "exchange a dangerous drug with another" by giving cocaine and receiving heroin in return. By the same token, one would not "exchange any dangerous drug with another" by paying *money* to obtain the drug. In ordinary parlance, for example, one would not describe buying a pair of pants for twenty-five dollars as "exchanging pants with another."

■ Even assuming that the legislature's use of "exchange with another" creates some doubt about whether it intended "to buy" or "to offer to buy" to come within its definition of "to distribute," we would be hard-pressed to resolve the ambiguity in favor of the State given the general rule of construction that ambiguous penal statutes are to be construed in favor of the accused. *See State v. Rodgers*, 68 Haw. 438, 444, 718 P.2d 275, 278 (1986).

Moreover, the canon of construction denominated *noscitur a sociis* counsels against our interpreting "exchange with another" as the equivalent of "to buy." *Noscitur a sociis* " 'may be freely translated as "words of a feather flock together," that is, the meaning of a word is to be judged by the company it keeps.' " *State v. Deleon*, 72 Haw. 241, 244, 813 P.2d 1382, 1384 (1991) (quoting *Advertiser Publishing Co. v. Fase*, 43 Haw. 154, 161 (1959)). *See also* HRS § 1–15(1).[2] "Exchange with another" follows "barter" in HRS § 712–1240's definition. Because "barter"[3] clearly implies the trading of commodities—*i.e.*, commodity for drugs, but not cash for drugs—under *noscitur a sociis*, "exchange with another" should be similarly construed. In addition, as noted above, all of the other words the legislature used to define "to distribute" (sell, transfer, prescribe, give, deliver, etc.) clearly indicate that the legislature intended to proscribe the supplying or providing of dangerous drugs "*to* another." HRS § 712–1240 (emphasis added). It would be incongruous, then, to construe the legislature's use of "exchange with another" as indicating its intention to proscribe the purchase or receipt of drugs *from* another.

Such a construction would also be inconsistent with the design of our drug trafficking statutes. The drug trafficking statutes, including HRS § 712–1242, make a clear distinction between distributors (*i.e.*, suppliers or sellers) and possessors according to the amount of drugs possessed or dispensed.[4] In explaining the rationale for treating possessors and distributors differently, the Commentary to HRS §§ 712–1241 to 1250[5] states:

> It is the purpose of the Code to hit hardest at the illegal trafficker in dangerous drugs, harmful drugs, and detrimental drugs. The scheme devised for so doing is to arrange the sanctions relating to each substance, either for possession or distributing, on the basis of the amounts involved. Such amounts are meant to reflect, i.e., provide an indicia of the position of the defendant in the illegal drug traffic.... In keeping with purpose of the Code, the greater the amounts involved the more severe the sanctions. Also, it will be noted

**2.** HRS § 1–15(1) (1985) provides that where the words of a law are ambiguous, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning."

**3.** "Barter" is defined to mean, *inter alia*, "1. to trade by exchange of commodities. 2. to exchange in trade, as one commodity for another; trade." *Random House College Dictionary* 111 (rev. ed. 1979).

**4.** Compare, *e.g.*, HRS §§ 712–1241(1)(a) and 712–1241(1)(b) (Supp.1992).

**5.** "The Commentary accompanying the Penal Code ... may be used as an aid in understanding the provisions of the Code, even though it was not intended as evidence of legislative intent." *State v. Anderson*, 58 Haw. 479, 483 n. 5, 572 P.2d 159, 162 n. 5 (1977) (citations omitted). *See also State v. Gaylord*, 78 Hawai'i 127, 890 P.2d 1167, 1178 (Haw.1995); HRS § 701–105 (1985).

that the offenses of distributing a given substance are classed or graded one degree above the possession of the same amount. Thus, for example, in §§ 712–1241 and 1242, the possession of "wholesale" amounts of a dangerous drug is a class A felony; however, the defendant who distributes "retail" amounts of a dangerous drug will receive the same sanction, whereas possession of that amount is a class B felony. In equating, for purposes of classification and sanction, possession of a given amount of a substance with distributing a somewhat smaller amount, the [penal code] attempts to provide the same sanction for persons at the same level of involvement in the trafficking of a particular substance. For example, a "pusher" is likely to possess a larger supply of one or more of the specified substances which he would distribute on a given occasion; he will break down his supply into smaller marketable amounts before distributing.

Commentary to HRS §§ 712–1241 to 1250 (1985).

Treating a buyer as a distributor would blur the intended distinction between suppliers/distributors and possessors and would effectively nullify the legislature's construct that possessors of a given amount of a particular substance occupy the same position in the drug trade as distributors of a comparatively smaller amount. For instance, all of those possessors who bought their drugs could, at the discretion of the prosecutor, be charged with distribution.

Consider, for example, a person caught possessing, but not selling, an eighth of an ounce of cocaine. Ordinarily, that person would face a possession charge—promoting a dangerous drug in the second degree, a class B felony. *See* HRS § 712–1242(1)(b)(i). Because the legislature presupposes that that person occupies the same role in the drug trafficking world as the seller of less than one eighth of an ounce, *see* Commentary on HRS §§ 712–1241 to 1250, the seller of a less than one eighth of an ounce faces the same class B felony penalty. HRS § 712–

1242(1)(c). For the same reason, distribution of an equal amount (*i.e.,* one eighth of an ounce) of cocaine carries a heavier class A felony penalty. *See* HRS § 712–1241(1)(b)(ii)(A).

If, however, "to distribute" means "to buy," and the person had bought the eighth of an ounce, he/she could be charged as not only a possessor, but also as a distributor. That would expose him/her to a charge of promoting a dangerous drug in the first degree, a class A felony. Normally, only sellers/suppliers of an eighth of an ounce or more would face that charge.[6] *Id.* That is contrary to the drug trafficking statutes' goal of treating possessors and distributors/suppliers differently according to the amount of drugs possessed or dispensed. Because it is our duty to interpret statutory language in the context of the whole statute and in a manner consistent with the purposes of the statute, *Lealaimatafao v. Woodward–Clyde Consultants,* 75 Haw. 544, 551, 867 P.2d 220, 224 (1994), we therefore decline to interpret "to distribute" as meaning "to buy."

We also reject that interpretation because it draws an arbitrary distinction among possessors on the basis of the manner in which they obtained a given amount of a dangerous drug. For instance, if a person who stole an eighth of an ounce of cocaine is caught with it in his/her possession, he/she could be charged with promoting a dangerous drug in the second degree, a class B felony. HRS § 712–1242(1)(b)(i). If, however, that same person bought the drug, under the State's interpretation of the statute, he/she could be charged with promoting a dangerous drug in the first degree, a class A felony. HRS § 712–1241(1)(b)(ii)(A). If the goal of the drug trafficking statutes is "to provide the same sanction for persons at the same level of involvement in the trafficking of a particular substance," Commentary to HRS §§ 712–1241 to 1250, it would make no sense to punish one person who obtained possession of an eighth ounce of cocaine by purchasing it more severely than another person who obtained the same amount by some other

---

**6.** A possessor would face that charge only if he/she possessed an ounce or more. HRS § 712–1241(1)(a)(i).

means. Such persons occupy equivalent positions in the drug business.

In short, we believe that "to buy" clearly falls outside the meaning of "to distribute," as that term is defined in HRS § 712–1240.

The State's citation to our case law upholding convictions for promoting dangerous drugs in cases where the defendants were caught in "reverse stings" does not change our opinion. The State relies heavily on *State v. Agrabante*, 73 Haw. 179, 830 P.2d 492 (1992). Among other things, *Agrabante* held that: (1) the police did not violate the due process rights of the defendant by making him the subject of a reverse buy operation—that is, by supplying and selling cocaine to him; and (2) absent evidence of inducement by law enforcement officials, a reverse buy did not constitute entrapment as a matter of law. The State essentially argues that, by sanctioning the use of reverse buys and upholding the conviction of a person who bought drugs, we implicitly held that buying drugs constitutes distribution. That statement might have some validity if the defendant in *Agrabante* had been charged with *distributing* a dangerous drug. However, the defendant was charged with *possessing* a dangerous drug, in violation of HRS § 712–1241(1)(a)(i). 73 Haw. at 180–81, 830 P.2d at 493. Thus, the question whether a person "distributes" a dangerous drug by buying it was not raised in *Agrabante*. In other words, *Agrabante* simply held that reverse buys, at least as a general matter, can be a legitimate law enforcement tool; it did not hold, even implicitly, that a person distributes a dangerous drug by purchasing it. Therefore, the State's reliance on *Agrabante* is completely misplaced.

## III. *CONCLUSION*

Based on the foregoing, we hold that "to distribute," as that term is defined in HRS § 712–1240, does not include "to buy" or "to offer to buy." Because the undisputed evidence at trial was that Aluli did nothing more than offer to buy cocaine from Kawano, she did not, as a matter of law, violate HRS § 712–1242(1)(c). We therefore reverse Aluli's conviction.

LEVINSON, Justice, concurring.

Because, for the reasons stated in the opinion of the court, " 'to buy' clearly falls outside the meaning of 'to distribute' as that term is defined in HRS § 712–1240 [ (1985) ]," opinion of the court at 174, I concur fully in the court's holding "that 'to distribute,' as that term is defined in HRS § 712–1240, does not include 'to buy' or 'to offer to buy,' " *id.* at 174, and that, therefore, on the undisputed record before us, the defendant-appellant Aluli "did not, as a matter of law, violate HRS § 712–1242(1)(c) [ (Supp.1992) ]." *Id.*

I believe, however, that the court's analysis ends prematurely, and so I am compelled to write separately.

Aluli was charged with, tried for, and convicted of the offense of promoting a dangerous drug in the second degree in violation of HRS § 712–1242(1)(c), a class B felony punishable by an indeterminate ten-year prison term, *see* HRS §§ 712–1242(2) (Supp.1992) and 706–660(1) (Supp.1992), for having allegedly *"distribute[d]* any dangerous drug in any amount." (Emphasis added.) As I will demonstrate, however, this trick could only be performed if, given the uncontroverted evidence adduced at Aluli's trial, "distributes," as that term is employed in HRS § 712–1242(1)(c), is fungibly synonymous with "possesses," as that term is employed in HRS § 712–1243(1) (1985)[1]—Promoting a dangerous drug in the third degree—, a class C felony punishable by an indeterminate five-year prison term. *See* HRS §§ 712–1243(2) (1985) and 706–660(2) (Supp.1992). Accordingly, I would hold that *if* "possesses" and "distributes" are statutory synonyms for purposes of the drug laws, then Aluli's conviction in the present case would violate her rights to due process and the equal protection of the laws as guaranteed by article I, section 5 of the Hawai'i Constitution.

"Possession is not defined in the [Hawai'i] Penal Code. However, Black's Law Dictio-

---

**1.** HRS § 712–1243(1) provides that "[a] person commits the offense of promoting a dangerous drug in the third degree if [the person] knowing-

ly *possesses* any dangerous drug in any amount." (Emphasis added.)

nary defines the word as[ ] ['the] detention and control, or ... custody, of anything which may be the subject of property....[' "] *State v. Mundell,* 8 Haw.App. 610, 617, 822 P.2d 23, 27, *cert. denied,* 72 Haw. 619, 841 P.2d 1075 (1991).

> One purpose of [the penal statutes relating to drugs and intoxicating compounds] is to penalize drug law offenders according to the potential for abuse and social harm involved in their activities, hitting hardest at illegal traffickers (those who either *"possess* large quantities of dangerous drugs, harmful or detrimental drugs, or who *distribute* [ ] it in any amount"). Hse. Conf.Comm.Rep. No. 1, in 1972 House Journal, at 1040; *see also* Commentary on HRS §§ 712–1241 to –1250. Thus, the legislature established a hierarchy of offenses based on the amount and kind of drugs possessed. *See* HRS §§ 712–1241 to 1250 (1985 & Supp.1990). This hierarchy indicates the legislature's determination of the possessor's position in the illegal drug stream. *Larger amounts indicate the possessor is a main source of supply;* lesser amounts indicate the possessor is a middle man between the main supply source and the consumer; *the smallest amounts indicate the possessor is a consumer or user.* Commentary to HRS §§ 712–1241 to –1250.

*Id.* at 619–20, 822 P.2d at 28 (some emphases and brackets in original and some added).

Under the Hawai'i Penal Code, "the offenses of distributing a given substance are classed or graded *one degree above* the possession of the same amount." Opinion of the court at 172 (quoting the Commentary on HRS §§ 712–1241 to –1250) (emphasis added). And yet, by blurring "the intended distinction between suppliers/*distributors* and *possessors* " (emphasis added), "all of those *possessors* who bought their drugs could, at the discretion of the prosecutor, be charged with *distribution."* *Id.* at 172–173 (emphasis added).

This court has ruled that

> [a] denial of [the] rights [to due process and the equal protection of the laws] would ... result ... if a violation of [a] misdemeanor statute ... would invariably and necessarily constitute a violation of [a] felony provision.... Thus, where the same act committed under the same circumstances is punishable either as a felony or as a misdemeanor, under either of two statutory provisions, and the elements of proof essential to either conviction are exactly the same, a conviction under the felony statute would constitute a violation of the defendant's rights to due process and the equal protection of the laws.

*State v. Modica,* 58 Haw. 249, 250–51, 567 P.2d 420, 421–22 (1977) (citations omitted). The *"Modica* rule," which applies equally to the possibility of prosecution and conviction under two differentially classed felonies (for example, under either a class B felony statute or a class C felony statute), was expressly reaffirmed in *State v. Kuuku,* 61 Haw. 79, 80–81, 595 P.2d 291, 293 (1979):

> Illustrative of the situation contemplated by *Modica* is the factual and statutory posture to be found in *United States v. Young,* 376 A.2d 809 (D.C.App.1977), where the defendant was indicted for the alleged violation of a felony statute which provided that "[w]hoever threatens within the District of Columbia to kidnap any person or to injure the person of another or physically damage the property of any person [shall be punished]." The defendant claimed that he should have been charged under the misdemeanor statute which provided that "[w]hoever is convicted in the District of threats to do bodily harm [shall be punished]." *Every* violation of the latter statute would have invariably and necessarily constituted a violation of the felony statute. Thus, under *Modica* the defendant's claim would have been upheld. We reaffirm this rule.

*Kuuku,* 61 Haw. at 81 n. 1, 595 P.2d at 293 n. 1 (emphases and brackets in original).

Assuming, as the State, by clear implication, would have us do in this case, that "possesses" and "distributes" are fungible statutory terms, then Aluli could have been charged with and convicted of either "distribut[ing] any dangerous drug in any amount" (Promoting a dangerous drug in the second degree), in violation of HRS § 712–1242(1)(c), or "possess[ing] any dangerous drug in any

amount" (Promoting a dangerous drug in the third degree), in violation of HRS § 712–1243(1). Inasmuch as a violation of the latter would invariably and necessarily constitute a violation of the former, we would at long last have a case to which the *Modica* rule would squarely apply.