955 P.2d 100

**Jusinto I. MACABIO and Rosalyn S. Macabio, Petitioners– Appellants,**

v.

**TIG INSURANCE COMPANY, a California corporation, Calen R. Matsuno, John Does 1–10, Jane Does 1–10, Doe Corporations 1–10, Roe "Non–Profit" Corporations 1–10, and Roe Governmental Entities 1–10, Defendants–Appellees.**

No. 19659.

Supreme Court of Hawai'i.

May 21, 1998.

308

Bert S. Sakuda, of Cronin, Fried Sekiya, Kekina & Fairbanks, on the briefs, Honolulu, and Louis P. Mendonca, Hilo, for plaintiffs-appellants.

Rhonda A. Nishimura, Francis M. Nakamoto, of Ayabe, Chong, Nishimoto, Sia & Nakamura, on the briefs, Honolulu, for defendant-appellee TIG Insurance Company.

James H. Hershey, of Fukunaga, Matayoshi, Hershey & Ching, on the briefs, Honolulu, for defendant-appellee Calen R. Matsuno.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

KLEIN, Justice.

This appeal arises out of an insurance dispute over plaintiffs-appellants Jusinto and Rose Macabio's entitlement to stacked underinsured motorist (UIM)[1] benefits under their automobile insurance policy with defendant-appellee TIG Insurance (TIG). The circuit court granted TIG's motion for summary judgment in a declaratory judgment action. The circuit court's ruling declared that TIG presented a legally sufficient offer to the Macabios to elect stacking of their uninsured motorist (UM)[2] coverage and UIM coverage and that no written rejection of the stacking

---

1. UIM coverage provides liability insurance in a case where an insured person is injured by an underinsured motor vehicle. HRS § 431:10C–103 (1993 & Supp.1997) defines "underinsured motor vehicle" in pertinent part as "a motor vehicle ... for which the sum of the limits of all bodily injury liability insurance coverage and self-insurance applicable at the time of loss is less than the liability for damages imposed by law."

2. UM coverage provides liability insurance in a case where an insured person is injured by an uninsured motor vehicle. HRS § 431:10C–103 (1993 & Supp.1997) defines "uninsured motor vehicle" in pertinent part as "[a] motor vehicle for which there is no bodily injury liability insurance or self-insurance applicable at the time of the accident."

option was required for TIG to refuse payment of stacked UIM benefits to the Macabios.

On appeal, the Macabios argue that: (1) the offer was legally insufficient; (2) TIG was required by statute to obtain a written rejection of the stacking option; and (3) there are genuine issues of material fact as to agent Matsuno's liability.

TIG argues that: (1) the offer was legally sufficient; and (2) they were not required by statute to obtain a written rejection of the stacking option.

Agent Matsuno argues that: (1) Hawai'i recognizes no legal duty to make unsolicited calls to clients; (2) no special relationship existed that would mandate unsolicited calls; (3) no other professionals in Hawai'i have a legal duty to make unsolicited calls to clients; and (4) costs and fees should be awarded to him for this frivolous appeal.

Because we hold that (1) TIG's offer of the stacking option was legally insufficient, (2) TIG was required by statute to obtain a written rejection of the stacking option, and (3) there are no genuine issues of material fact as to agent Matsuno's liability, we reverse the circuit court's order granting TIG's motion for summary judgment, and affirm the circuit's order granting agent Matsuno's motion for summary judgment.

## I. BACKGROUND

In November 1993, Jusinto Macabio was seriously injured in an automobile accident when another car, driven by Debra Yamamoto, rear-ended his car. Ms. Yamamoto's liability was undisputed and the Macabios settled with Ms. Yamamoto's insurance carrier for the bodily injury policy limit of $25,-000.00. Because Jusinto's medical bills far exceeded the $25,000.00 settlement, the Macabios filed a claim with TIG for stacked UIM benefits under their own policy. At the time of the accident, the Macabios' insurance policy with TIG included UIM coverage for four vehicles in the amount of $100,000.00

per vehicle. Under the terms of the policy, the Macabios' coverage was unstacked.

The Macabios renewed their insurance policies with TIG semi-annually every January 22nd and July 22nd. On January 22, 1993, the Macabios renewed their automobile insurance. No stacking option was offered that time. However, on July 16, 1993, TIG sent a form letter to the Macabios informing them of the option to stack their UM and UIM benefits. By this time, the Macabios had already paid their premium for the July 22nd renewal.[3] The letter stated in pertinent part:

UNINSURED (UM) AND UNDERINSURED MOTORISTS COVERAGES (UIM)—INCREASED LIMITS AND STACKING OPTION

*Rejection of Coverage*

In accordance with Hawaii laws, you may reject UM and/or UIM coverages. If you would like to reject either or both of these coverages, please initial the appropriate item(s) on the enclosed Coverage Selection form.

If you previously rejected either or both of these coverages, the coverage will remain rejected until you write to us and request they be added. For your convenience, the enclosed Coverage Selection form allows you to add either or both of these coverages. The limit you select may be equal to or less than the limits for BI under your policy.

. . . .

*Stacking*

In addition, Hawaii law now prohibits stacking of UM and/or UIM coverage limits. However, the law allows for the coverages to be stacked at YOUR option. Due to this new law, if UM and/or UIM coverages were previously part of your policy the enclosed renewal reflects non-stacked coverage(s) and premium(s). Compared to stacked coverage premiums, non-stacked coverage premiums are lower.

"Stacking" UM means you can claim a total of the limits for UM Coverage as-

---

**3.** It is unclear from the record the exact date of payment. Jusinto Macabio only testified that he paid his premium prior to the due date.

signed to each vehicle on the policy. Similarly, "stacking" of UIM Coverage means you can claim a total of the limits for UIM Coverage assigned to each vehicle on the policy. For example, if a policy, has two vehicles each with "stacked" UM limits of $75,000 per person and $75,000 per accident, then UM coverage limits would be a total of $150,000 per person and $150,000 per accident.

"Non-stacked" UM and UIM coverage means that the limit shown on the declarations applies separately to each vehicle. For example, a "non-stacked UM or UIM limit per vehicle of $75,000 per person and $75,000 per accident would provide no more than these limits of coverage in any one accident.

The enclosed Selection form allows you to request "stacked" UM or UIM Coverages. Premium for the "stacked" options are provided alongside the premiums for the same limit with "non-stacked" coverage for easy comparison. If the Selection form is not returned, or this section is left blank, your coverage will remain "non-stacked" at the limit shown in the enclosed renewal restatement.

Enclosed with the letter was a separate coverage selection form that contained the stacking options for uninsured motorist and underinsured motorist benefits, and a declarations page that stated the Macabios' current coverage under their policy. The first paragraph of the form stated the following:

> This form should be completed and signed by the insured indicated above. **Please return this form within 20 days along with your premium payment, using the enclosed postage paid envelope. If we do not receive this form from you, coverage will remain as stated on the enclosed declarations/renewal statement.** Any selections you make which result in a premium increase or decrease will be reflected in any future billing notices sent to you.

(Emphasis in original.)

The second paragraph of the form contained a chart of the various limits offered by TIG and the relevant premiums:

OPTION FOR UNINSURED (UM) AND UNDERINSURED MOTORISTS (UIM) COVERAGES

The draft below is a premium comparison of the per vehicle charge for each limit we make available. Please reference this chart when making the selections noted below.

| Limits Available (per person/ per accident) | Non-Stacked UM | Stacked UM | Non-Stacked UIM | Stacked UIM |
|---|---|---|---|---|
| $ 25,000/25,000 | $ 5 | $ 7 | $ 8 | $12 |
| $ 35,000/35,000 | $ 6 | $ 8 | $10 | $14 |
| $ 50,000/50,000 | $ 7 | $ 9 | $13 | $19 |
| $ 75,000/75,000 | $ 9 | $13 | $17 | $23 |
| $100,000/100,000 | $10 | $14 | $19 | $27 |
| $100,000/300,000 | $14 | $19 | $26 | $37 |
| $200,000/200,000 | $14 | $19 | $26 | $37 |
| $200,000/400,000 | $17 | $23 | $33 | $47 |
| $300,000/300,000 | $17 | $23 | $33 | $47 |
| $300,000/600,000 | $18 | $25 | $37 | $53 |
| $500,000/500,000 | $20 | $27 | $39 | $56 |

On the bottom of the first page, and continuing to the second page, the form contained the following provision pertaining to stacking:

Stacked UM and UIM Coverage Selection (This section is applicable only if UM and/or UIM selected)

Initial either or both options below if stacked coverage is desired.

_____
Initials

In return for the increased premium noted in the chart above, please stack my Uninsured Motorists Coverage at the limit noted under UM Coverage and Limit Selection in this form.

_____ In return for the increased
Initials  premium noted above, please
          stack my Underinsured Motorists
          Coverage at the limit noted under
          UIM Coverage and Limit Selection
          in this form.

If they opted to stack their insurance, the Macabios were to place their initials next to the stacking option clause. If the Macabios did not want to stack their benefits, they simply were not to initial the form. There was no clause requiring that they initial or sign to indicate they were *rejecting* the stacking option. The Macabios did not return the form to TIG. Accordingly, their UIM and UM benefits were left unstacked.

On August 9, 1993, the Macabios purchased another automobile policy from TIG to cover a fourth vehicle. TIG did not offer the stacking option to the Macabios when they purchased this additional policy. The accident involving Ms. Yamamoto occurred in November 1993.

Consequently, because their UIM coverages were unstacked, TIG refused the Macabios' claim for stacked benefits. On March 14, 1995, the Macabios filed a complaint against TIG seeking a declaration that their multiple automobile insurance policies obligated TIG to provide stacking of their UIM benefits. The complaint also asserted claims of bad faith and unfair and deceptive trade practices and also named TIG insurance agent Calen Matsuno as a defendant.

During the pendency of the declaratory judgment action, the parties agreed to arbitrate their dispute on the issue of damages. On August 31, 1995, the arbitrator awarded Jusinto general and special damages of $357,795.86 and awarded his wife, Rosalyn Macabio, $25,000.00 for loss of consortium. The Macabios moved the circuit court to confirm the arbitration awards. On September 21, 1995, the circuit court granted the motion for confirmation and declared that TIG was responsible for paying the Macabios up to $357,795.86 in UIM benefits, as limited by the applicable limits of their insurance coverage. The order did not confirm, deny or otherwise mention the $25,000.00 award to Rosalyn. The Macabios filed a timely notice

of appeal from the court's confirmation order on October 24, 1995 (S.C. No. 19359).

On June 6, 1995, the Macabios filed a motion for partial summary judgment, arguing that TIG was required to obtain a written rejection of stacking coverage from them; otherwise, the stacking coverages must be implied as a matter of law. At the hearing on the motion on September 19, 1995, TIG orally moved for summary judgment, which was granted by the circuit court. The circuit court denied the Macabios' motion for partial summary judgment.

On October 12, 1995, defendant-appellee agent Calen Matsuno filed a motion for summary judgment on the breach of duty claims, arguing that an insurance agent owes no duty to an insured to advise of available coverages. The motion was heard on November 28, 1995, and granted on January 19, 1996.

The Macabios then filed this timely appeal of the orders granting TIG's and agent Matsuno's motions for summary judgment.

## II. *STANDARD OF REVIEW*

We review the lower court's interpretation of a statute *de novo*. *Shimabuku v. Montgomery Elevator Co.*, 79 Hawai'i 352, 357, 903 P.2d 48, 52 (1995). "The starting point in statutory construction is to determine the legislative intent from the language of the statute itself." *State v. Kaakimaka*, 84 Hawai'i 280, 289, 933 P.2d 617, 626, *reconsideration denied*, 84 Hawai'i 496, 936 P.2d 191 (1997). "[O]ur foremost obligation [when interpreting a statute] is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statute itself." *State v. Aluli*, 78 Hawai'i 317, 320, 893 P.2d 168, 171 (1995) (citation omitted). We read statutory language in the context of the entire statute "and construe it in a manner consistent with its purpose." *Mathewson v. Aloha Airlines, Inc.*, 82 Hawai'i 57, 71, 919 P.2d 969, 983 (1996) (citation and internal quotation marks omitted).

We review a circuit court's award of summary judgment *de novo* under the same standard applied by the circuit court. *Amfac,*

*Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 104, 839 P.2d 10, 22 *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992). As we have often articulated,

> summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Id.* "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Hulsman v. Hemmeter Dev. Corp.,* 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted).

## III. *DISCUSSION*

### A. *The only outcome-determinative issue on appeal is the sufficiency of the stacking offer made by TIG.*

The Macabios argue that according to the law in effect at the time of the accident, TIG was required to offer them the option to stack their underinsured motorist coverage when they renewed their policies on January 22, 1993 and July 22, 1993, and when they purchased an additional policy for a fourth vehicle on August 9, 1993.

The Macabios contend that the "Dear Hawaii Customer" letter was an insufficient offer because it was not offered with any of the renewals. The letter was mailed six months after the January 22, 1993 renewal and was received after they had already paid their premium for the July 22, 1993 renewal. As a result, they renewed their policy without the benefit of a stacking offer.

TIG, on the other hand, asserts that the issue of whether it was required to offer the stacking option with the January 22, 1993 renewal and the August 9, 1993 purchase should not be heard on appeal because these issues were never raised in the circuit court, and adjudication of these issues would require additional facts not presented on appeal. TIG notes that the only offer at issue before the lower court, and hence, on appeal,

is the July 1993 offer. TIG is correct for the following reasons.

The law in effect at the time of the accident was Hawai'i Revised Statutes (HRS) § 431:10C–301, as amended by the 1992 legislature. The 1992 amendments required insurers to offer a stacking option for UM and UIM coverage. As amended, the statute provided in relevant part:

> (b) A motor vehicle insurance policy shall include:
>
> . . . .
>
> (4) Coverage for loss resulting from bodily injury or death suffered by any person legally entitled to recover damages from owners or operators of underinsured motor vehicles. An insurer may offer the underinsured motorist coverage required by this paragraph in the same manner as uninsured motorist coverage; provided that such offer of both shall: .
>
> . . . .
>
> (C) provide for written rejection of the coverage by requiring the insured to affix the insured's signature in a location adjacent to or directly below the offer.
>
> (c) The stacking or aggregating of uninsured or underinsured motorist coverage, whichever is applicable, is prohibited. However, an insurer shall offer an option to stack uninsured motorist and underinsured motorist coverage, as applicable, in each no-fault policy *whenever any policy is issued, delivered, or renewed.*
>
> (d) An insurer shall offer uninsured motorist coverage and underinsured motorist coverage of not less than the amount of the maximum bodily injury liability coverage in the insured's policy when the policy is first issued; provided that written rejection shall only be required when the policy is first issued or first renewed. No further rejections are required.

HRS § 431:10C–301, as amended by 1992 Haw. Sess. L. Act 123, § 4 at 208–209 (emphasis added).

█ Under this statute, TIG was required to "offer an option to stack uninsured motorist and underinsured motorist coverage . . .

*whenever* any policy [was] *issued,* delivered, or *renewed."* *Id.* Accordingly, from the plain language of the statute, it is clear that TIG was required to offer the stacking option to the Macabios in connection with their renewals on January 22, 1993 and July 22, 1993. However, the fact that TIG failed to offer the stacking option for the January 22, 1993 renewal is irrelevant to the outcome of this case because this policy was not in effect at the time of the accident. This policy expired on July 22, 1993. The accident occurred in November 1993. Thus, the policy relevant to this appeal is the policy that was in effect on July 22, 1993.

■ As to the Macabios' claim that the offer was not made in connection with any renewal, this issue is improperly raised for the first time on appeal, and consequently, will not be addressed. "The general rule is that an issue which was not raised in the lower court will not be considered on appeal." *Kernan v. Tanaka,* 75 Haw. 1, 35, 856 P.2d 1207, 1224 (1993), *cert. denied,* 510 U.S. 1119, 114 S.Ct. 1070, 127 L.Ed.2d 389 (1994) (citations omitted). The record is bereft of any evidence that the timeliness of the offer was ever disputed in circuit court. To the contrary, the Macabios acknowledged in their memorandum in support of the motion for partial summary judgment and at the hearing that the offer was made in connection with the July 22nd renewal. In their memorandum in support of the motion for partial summary judgment, they stated that "[i]n July 1993, before the accident, and *for the policy period covering the accident,* the Macabios received, through the mail, a TIG premium payment notice, and *policy renewal,* which *included* the following forms entitled: 1) 'Coverage Selection Form—Hawaii;' ... 6) a letter entitled 'Dear Hawaii Customer.' "

At the hearing, counsel for the Macabios also agreed that the letter was made in connection with the July 22nd renewal and made no objection to this statement:

> [THE COURT]: Okay. And what we're concerned about is the July—July 1993 offer regarding the stacking of underinsurance motorist coverage.
>
> [MACABIOS]: That's correct.

[THE COURT]: *And apparently this was made in connection with a renewal?*

[MACABIOS]: *Yes.*

[THE COURT]: So far okay or is it a little bit different? You guys gotta tell me now. It was a renewal and this was a separate package?

[TIG]: Yes, they already had joined the stacking before and this is a renewal, correct.

[THE COURT]: Okay.

[TIG]: I'm sorry, let—let me correct that. They had no stacking before; *this is the renewal.* There was no stacking in the policy before the renewal which, uh, was triggered by the—the Act.

[THE COURT]: Okay. Made the offer for the stacking which was apparently not accepted.

[TIG]: Correct.

Because timeliness of the offer was never raised in the lower court, the offer is deemed to have been made in a timely manner in connection with the July 22nd renewal.

■ Furthermore, the fact that the Macabios paid their premium before they received the TIG offer is of no consequence. To hold TIG responsible for notifying their insureds prior to the time the insureds *pay* their premiums would require TIG to engage in the impossible task of reading the minds of their insureds and predicting when they planned to pay their premiums. We cannot ask TIG to bear such an unrealistic burden. TIG had a duty to offer the stacking option in a timely manner *prior to the date of renewal,* not when the insured chose to make payment.

■ Whether TIG was required to offer the stacking option in connection with the additional coverage purchased on August 9, 1993, is also irrelevant to this appeal. TIG is correct that the adjudication of this issue would require additional findings of fact not available on appeal. To decide this issue would require us to determine whether the August 9th transaction for the fourth vehicle was a purchase of a new policy, according to the Macabios, or an amendment to the existing policy, according to TIG. Because this

argument was never raised in the circuit court proceedings, the record is insufficient to make such a determination without speculation. Thus, we decline to hold that this issue affects the outcome of this case.

Accordingly, the only outcome-determinative issue on appeal is the sufficiency of the offer made in connection with the July 22, 1993 renewal.

## B. *TIG's offer to stack benefits was legally insufficient under Mollena.*

TIG sent the "Dear Hawaii Customer" letter to the Macabios in July 1993, offering them the option to stack their underinsured motorist benefits and informing them of the 1992 amendments. The Macabios argue that this offer was legally insufficient because it failed to comply with the four-part test set forth in *Mollena v. Fireman's Fund Insurance Company of Hawaii, Inc.,* 72 Haw. 314, 816 P.2d 968 (1991).

TIG, however, contends that this letter and the accompanying coverage selection form sufficiently apprised the Macabios of their option to stack their underinsured motorists benefits and clearly informed them that if the form was not returned, or the option to stack was not selected, their coverage would remain unstacked. Furthermore, TIG urges that the offer satisfied all four prongs of the *Mollena* test.

In *Mollena,* this court set forth a four-part test to determine the legal sufficiency of an offer of insurance coverage to meet the statutory requirements. Under the particular circumstances of this case, the offer made by TIG was legally insufficient.

Under *Mollena's* four part test, an offer is legally sufficient when all of the following are met:

(1) if made other than face-to-face, the notification process must be commercially reasonable; (2) the limits of the optional coverage must be specified and not merely offered in general terms; (3) the insurer must intelligibly advise the insured of the nature of the optional coverage; and (4) the insurer must apprise the insured that the optional cover-age is available for a relatively modest increase in premium.

*Mollena,* 72 Haw. at 320, 816 P.2d at 971 (citations omitted).

On appeal, the Macabios argue that TIG's offer of the stacking option in the "Dear Hawaii Customer" letter and the enclosed coverage selection form was legally insufficient because (1) the timing of the offer "was not commercially reasonable because it was not made at the time of the renewal when selection of coverages for the renewal was relevant;" (2) "the TIG offer did not 'intelligibly advise' insureds because it did not disclose that stacked coverage was superior and cheaper than non-stacked coverage;" and (3) the offer "was inaccurate because it gave insureds the erroneous impression that the premium for stacked coverage was higher than for non-stacked coverage." In essence, the Macabios assert that the offer fails to satisfy the first, third, and fourth prongs of the *Mollena* test. The third and fourth prongs are dispositive.

### 1. *Mailing the letter was a commercially reasonable method of notification under part one of the test.*

The Macabios argue that the timing of the offer was commercially unreasonable because the offer was not made in connection with any renewal, as mandated by the statute. The Macabios contend that the letter was not timely for the July 22, 1993 renewal because it was received after the Macabios had already paid their renewal premium. As we stated earlier, the timeliness of the offer was never raised in the circuit court and thus cannot be addressed on appeal.

The record on appeal reveals that the Macabios did in fact acknowledge that the offer was made in connection with the July 22nd renewal.

Accordingly, the offer is deemed to be a part of the July 22nd renewal and according to *Mollena,* commercially reasonable. In *Mollena,* this court found that "[u]nder part one of the test, mailing the policyholder message with the renewal declarations was a commercially reasonable method of communicating with insured about a business transaction." *Id.* at 322, 816 P.2d at 972.

### 2. The offer specified the limits of stacking coverage and thus satisfied the second prong of the test.

■ The chart contained in the "Dear Hawaii Customer" letter specified the limits of coverage available for UM and UIM coverage, ranging from $25,000 per person/$25,000 per accident, to $500,000.00 per person/$500,000.00 per accident, stacked or unstacked. In *Mollena*, this court found that the limits of coverage were not clearly specified because "[t]he language of the policyholder message which states 'UNDER-INSURED/UNINSURED MOTORISTS COVERAGE $35,000 LIMIT' misleadingly suggests there is a single $35,000 coverage to be split between the underinsured and uninsured motorist coverages." *Id.*

In this case, there are four columns in the chart separating stacked and unstacked UIM benefits from stacked and unstacked UM benefits. Thus, the limits for stacked coverage is specifically delineated and satisfies the second prong of the test.

### 3. The offer did not intelligibly advise the insured of the nature of the stacked coverage, and thus fails to satisfy the third prong of the test.

■ The Macabios argue that the offer does not satisfy the third prong because the offer does not intelligibly advise them "that stacking coverage provides equal amounts of coverage at substantially lower premiums than non-stacked coverage and is *never* more expensive, so there is *never* an advantage to purchasing non-stacked coverage for multiple vehicles." (Emphasis added.) We find this argument persuasive.

In *Mollena*, this court held that the offer of underinsured and uninsured motorists benefits failed the third prong of the test because "the policyholder message lacked any definition or *examples or description* of the *nature* of underinsured motorist coverage." *Id.* at 322, 816 P.2d at 972 (emphasis added). The offer in this case contains an example explaining the difference between stacked versus unstacked benefits. The question is whether this example sufficiently conveys the *nature* of stacking versus non-stacking. We hold that it does not.

The "Dear Hawaii Customer" letter contains a provision explaining the nature of stacking by comparing the UM and UIM benefits of a stacked policy with that of a non-stacked policy. The example utilizes a two-car policy, each car with a $75,000.00 limit of UIM coverage and a $75,000.00 limit of UM coverage. From this example, it is clear that the stacked policy would result in the insured being able to claim benefits of $150,000.00, while the unstacked policy would result in benefits of only $75,000.00.

TIG argues that this example clearly illustrates the nature of stacking and thus is sufficient to satisfy the third prong. At a glance, this example seems sufficient in that it is true that a stacked two-car policy will result in double the benefit limit when compared to a non-stacked policy with the same coverage limit per vehicle. However, upon closer review, TIG's example is incomplete, and even misleading.

Without further explanation, the average insured is not likely to realize that he or she could purchase the same amount of coverage under a stacked, two-car policy with coverage of $25,000.00 on each vehicle, as an unstacked, two-car policy with coverage of $50,000.00 on each vehicle, but for a lower premium. For example, according to the chart provided by TIG in its coverage selection form, an unstacked two-car policy of UIM benefits, with a limit of $50,000.00 per vehicle, would result in a semi-annual premium of $26.00 (2 cars × $13.00). However, the same policy, with stacked UIM benefits of $25,000.00 per vehicle would result in a semi-annual premium of $24.00 (2 cars × $12.00). This results in a semi-annual savings of $2.00, or an annual savings of $4.00.

In this case, TIG sold the Macabios unstacked UIM coverage with a limit of $100,000.00 per vehicle, at $19.00 per car semi-annually. The Macabios had *four cars and* therefore paid $76.00 (4 cars × $19.00). Because the coverage was unstacked, the Macabios were protected to a maximum of $100,000.00. The premium, however, for $25,000.00 of stacked coverage was $12.00 per car for a total of $48.00 for four cars. This would result in coverage equivalent to

$100,000.00 of unstacked coverage, but would have cost only $48.00 semi-annually—a savings of $28.00 ($76.00—$48.00). Therefore, the Macabios could have obtained the same amount of coverage at a lower premium by selecting the stacking option.

Thus, the examples given in the offer clearly do not convey the true "nature" of stacked coverage. Without more, an insured with multiple vehicles is not likely to determine that the same amount of coverage in an unstacked policy could be purchased for a lower premium by selecting the stacking option. Accordingly, the offer fails to satisfy the third prong of the *Mollena* test.

4. *The offer did not apprise the insured that stacking coverage is available for a relatively modest increase in premium, and thus fails the fourth prong of the Mollena test.*

■ As demonstrated in the foregoing analysis, TIG's offer fails to inform the insured that stacking is available for a relatively modest increase in premium. Instead, the "Dear Hawaii Customer" letter advises the insured that "[c]ompared to stacked coverage premiums, non-stacked coverage premiums are lower." The coverage selection form also asserts that there is an "increased" premium for stacked coverage. As the Macabios correctly argue, these phrases are misleading because they "mislead insureds into believing that stacking coverage is more expensive." As demonstrated by the previous examples, although it is true that the per-vehicle charge is higher for stacked coverage, for persons who insure two cars or more, the total premium for the same amount of coverage is actually *lower* if the stacking option is chosen. Thus, for an insured with multiple vehicles, stacked coverage is the less expensive alternative.

Evidence of the legislative intent in enacting the 1992 amendments to the motor vehicle insurance law is contained in the conference committee report. The committee report states:

Because the bill also contains a prohibition against stacking of UM and UIM benefits,

these provisions will allow consumers to obtain sufficient UM and UIM insurance coverages. This trade-off between the elimination of stacking and these optional coverages will be equitable only if *consumers are fully informed of their loss of rights and ability to protect themselves through voluntary additional options at a nominal cost.*

Hse. Conf. Comm. Rep. No. 150, in 1992 House Journal, at 878 (emphasis added). The voluntary additional options referred to are in the optional stacking requirements. The intent of the legislature that consumers be fully informed is undercut by TIG's misleading information and set-up of the application for UM and UIM coverage. It would not be apparent to the average consumer that the same level of coverage could be purchased at a lower premium by using the stacking option. Also, the format of the coverage selection form, where the purchaser must initial next to the UM and UIM coverage clause to *reject* such coverage, but must initial next to the stacking clause to *select* the option, is confusing to the average consumer. Thus, the offer fails the fourth prong of the *Mollena* test.

Accordingly, TIG's offer contained in the "Dear Hawaii Customer" letter and the coverage selection form was legally insufficient insofar as it failed the third and fourth prongs of the *Mollena* test.

C. *TIG was required to obtain written rejection of stacking for uninsured motorist coverage.*

■ The Macabios' next argument is that TIG was required to obtain a written rejection [4] of the stacking option as mandated by HRS § 431:10C–301(d) (Supp.1992). The Macabios contend that subsection (d), requiring written rejection of underinsured and uninsured motorists benefits also applies to subsection (c), which requires an offer of stacked coverage. When all of the subsections pertaining to stacking are read together, it is clear that TIG was required to obtain a *written rejection* from the Macabios. Ac-

4. Written rejection requires the insured to "affix the insured's signature in a location adjacent to

or directly below the offer." HRS § 431:10C–301(b)(4)(C).

cordingly, the Macabios' failure to return the form was not a proper rejection of the option to stack, and thus stacking of their UIM benefits must be implied as a matter of law.

TIG counter argues that the statute only requires that it *offer* the stacking option and that it need not provide for written rejection of the offer. TIG contends that subsection (c) is entirely separate from subsection (d) and does not require a written rejection of stacking benefits. Thus, the stacking of UM and UIM benefits should not be implied because the Macabios were fully informed that their failure to return the form would result in their UIM benefits being left unstacked.

Subsequent legislative history of this statute establishes that TIG was required to obtain a written rejection of the stacking option from the Macabios. "[T]his court has used subsequent legislative history or amendments to confirm its interpretation of an earlier statutory provision." *In re John Doe, Born on January 5, 1976,* 76 Hawai'i 85, 92 n. 10, 869 P.2d 1304, 1311 n. 10 (1994) (citing *Franks v. City and County of Honolulu,* 74 Haw. 328, 340 n. 6, 843 P.2d 668, 674 n. 6 (1993)). *See also Sol v. AIG Hawai'i Ins. Co.,* 76 Hawai'i 304, 309, 875 P.2d 921, 926, *reconsideration denied* 76 Hawai'i 353, 877 P.2d 890 (1994).

In 1993, HRS § 431:10C–301 was amended to clarify the insurer's obligation to offer the option to stack UM and UIM coverage in an amount for each vehicle up to the personal injury limit of the policy for that vehicle. The amendments, however, did not result in any substantive change from the 1992 version of the statute.

Section (c) of HRS § 431:10C–301 (Supp. 1992) read, "The stacking or aggregating of uninsured or underinsured motorist coverage, whichever is applicable, is prohibited. However, an insurer shall offer an option to stack uninsured motorist and underinsured motorist coverage, as applicable, in each no-fault policy whenever any policy is issued, delivered, or renewed." In 1993, the legislature clarified this by splitting section (c) into two sections, (c) and (d). As amended, the sections stated that:

 (c) The stacking or aggregating of uninsured motorist coverage or underinsured

motorist coverage is prohibited, except as provided in subsection (d).

 (d) An insurer shall offer the insured the opportunity to purchase uninsured motorist coverage and underinsured motorist coverage by offering the following options with each no-fault policy:

 (1) The option to stack uninsured motorist coverage and underinsured motorist coverage; and

 (2) The option to select uninsured motorist coverage and underinsured motorist coverage, whichever is applicable, up to but not greater than the bodily injury liability coverage limits in the insured's policy.

 These offers are to be made when a no-fault policy is first applied for or issued. For any existing policies, an insurer shall offer such coverage at the first renewal after January 1, 1993. Once an insured has been provided the opportunity to purchase the coverages under the options, no further offer is required to be included with any renewal or replacement policy issued to the insured.

HRS § 431:10C–301 (1993) (as amended by 1993 Haw. Spec. Sess. L. Act 4, § 5 at 14).

In 1997, the legislature again amended this section. As amended, HRS § 431:10C–301(d) now reads:

 (d) An insurer shall offer the insured the opportunity to purchase uninsured motorist coverage and underinsured motorist coverage by offering the following options with each motor vehicle insurance policy:

  (1) The option to stack uninsured motorist coverage and underinsured motorist coverage[.]

  . . . .

 These offers are to be made when a motor vehicle insurance policy is first applied for or issued. . . . Once an insured has been provided the opportunity to purchase or *reject the coverages in writing* under the options, no further offer is required to be included with any renewal or replacement policy issued to the insured.

1997 Haw. Sess. L. Act 251, § 38 at 534–35 (emphasis added).

In the legislative history to the 1997 amendments, the conference committee stated that it intended to "clarify" that written rejection is required: "[The amendment] (4)

[c]larifies that written rejection is required for uninsured and underinsured motorist benefit options to eliminate any uncertainty." Conf. Comm. Rep. No. 171 (April 29, 1997).

In *Mollena, supra,* this court·used subsequent legislative history to determine that a written rejection of underinsured motorist ·coverage had been required under the previous language of the statute. In *Mollena,* the underinsured motorist coverage portion of the statute was amended in 1988 to specifically mandate written rejection. The legislative history for this new provision stated that "the purpose of this amendment was '*clarifying* that written rejection of coverage against underinsured motor vehicles shall be applied in the same manner as is presently utilized for uninsured motor vehicles.'" *Id.* at 325, 816 P.2d at 973 (emphasis added). The *Mollena* court utilized this subsequent legislative history to bolster its analysis that the intent of the legislature prior to the amendment was to require written rejection of underinsured motorist coverage.

In the instant case, the 1992 and 1993 versions of HRS § 431:10C–301 do not specifically state that a written rejection of the option to stack is required. However, in 1997, the legislature said that it was *clarifying* that stacked coverage had to be rejected in writing. Therefore, policies must be stacked if no written rejection is obtained.

Consequently, as clarified by the 1997 amendments, the offer to stack UM and UIM coverages under the 1993 statute must be rejected in writing. Because there is no substantive difference between the 1992 and 1993 statutes, it logically follows that written rejection was also required under the 1992 statute.

Accordingly, based on the legislative history, we hold that the legislature intended that rejection of stacked coverage must be in writing. Therefore, TIG's offer of coverage was inconsistent with the legislative intent because the offer required the insured to affirmatively select, rather than affirmatively reject, the stacking option.

---

**5.** Whether agent Matsuno was required to offer the stacking option during this transaction cannot be determined under the facts of this case. As discussed earlier, to decide this issue would require us to determine whether the August 9th transaction for the fourth vehicle was a purchase

### D. *There are no genuine issues of material fact as to TIG agent Calen Matsuno's liability.*

The Macabios cite *Quality Furniture, Inc. v. Hay,* 61 Haw. 89, 595 P.2d 1066 (1979), for the proposition that agent Matsuno had a "duty to the insured to exercise reasonable care, skill and diligence in carrying out [his] duties in procuring insurance." *Id.* at 92, 595 P.2d at 1068. The Macabios argue that agent Matsuno breached this duty by failing to call and advise them of this option although he knew that the Macabios' insurance policies were unstacked. The Macabios also contend that he breached this duty by failing to offer this option when he sold the Macabios an additional policy for a fourth vehicle.[5]

Agent Matsuno, on the other hand, argues that an insurance agent owes no duty to an insured to advise of available coverages, and that Hawai'i recognizes no legal duty to make unsolicited calls to clients. He bolsters his argument by citing to the language of HRS § 431:10C–301 (Supp.1992), and maintains that the statute places "any *duty of giving notice to the insured upon the insurance company, not the insurance agent.*" (Emphasis in original.) Hence, Matsuno insists, notifying the Macabios was the sole responsibility of TIG.

*Quality Furniture* is the only case on point in this jurisdiction. Accordingly, we turn to it for guidance. According to *Quality Furniture,* although an insurance agent owes a duty to the insured, "the extent of the responsibilities that the [agent] had in rendering help and providing advice to the [insured]" turns on the facts of each case.

In *Quality Furniture,* Jerry Hay was the insurance agent for Quality Furniture and provided fire insurance for Quality's three warehouses and three stores. A few weeks after Hay procured fire insurance for these properties, Quality leased a fourth warehouse. Hay procured casualty and workers' compensation insurance but, for various rea-

---

of a new policy, or an amendment to an existing policy. We cannot make such a determination without speculation. *See supra* at ——–——, 955 P.2d at 106–107. Accordingly, this issue will not be addressed.

sons, did not procure fire insurance for the fourth warehouse. Six months later, three warehouses burned down, including the fourth warehouse.

This court held that Jerry Hay was not negligent for failing to procure fire insurance for the fourth warehouse because: (1) Jerry Hay was Quality's insurance agent for only a few months before the warehouse was leased; (2) Hay could not procure additional insurance without the permission of Quality's vice-president; (3) Quality did not submit the report that would have informed Hay of the new storage location; and (4) Quality's book-keeper knew that the warehouse did not have fire insurance and failed to act to acquire insurance.

In deciding whether Hay was negligent, the *Quality Furniture* court cited the following two cases from other jurisdictions whose courts looked to the prior course of dealing between the insured and the insurance agent to determine if the agent was negligent. In *Hardt v. Brink*, 192 F.Supp. 879 (W.D.Wash. 1961), the insurance agent was the insured's exclusive agent for eight years and procured insurance for the insured's business when the insured described the business to the agent. The insured then leased another building and informed the agent. The agent did not procure insurance and the building burned down. The court held the agent liable because "the parties' *course of dealing* led the plaintiff to *justifiably rely* on the defendant under the circumstances." *Quality Furniture*, 61 Haw. at 93, 595 P.2d at 1069 (emphases added).

In *McCall v. Marshall*, 398 S.W.2d 106 (Tex.1965), the agent procured insurance for the insured's used car lot but did not procure insurance for another location when the insured informed him of this new location. The court held that the agent was not negligent because "the insured did not ask for extended coverage and in *prior dealings* the agent had not taken care of the customer's needs without the customer first consulting the agent." *Quality Furniture*, 61 Haw. at 93, 595 P.2d at 1069 (emphasis added). Thus, when looking at the facts of each case to determine the duty of an insurance agent, the nature of the relationship between the agent and the insured must be scrutinized. Accordingly, whether agent Matsuno had a duty to make an unsolicited call to the Macabios depends on whether agent Matsuno had made such calls in the past, so that the Macabios came to rely on Matsuno to inform them of changes in available coverages without their inquiry.

According to the record, there appears to be no evidence that the prior dealings between agent Matsuno and the Macabios created such reliance. Like the agent in the *McCall* case, agent Matsuno took care of the Macabios' needs only when the Macabios consulted him. There is no evidence set forth by the Macabios that agent Matsuno informed them of changes in the insurance laws on his own accord. Without such evidence, we cannot conclude that the Macabios "justifiably relied" on agent Matsuno to inform them of the changes in the insurance law pertaining to stacking.

Therefore, the circuit court did not err in granting summary judgment for agent Matsuno as to the Macabios' breach of duty claims, and the order is affirmed.

## IV. *CONCLUSION*

For the foregoing reasons, we reverse the circuit court's order granting TIG's motion for summary judgment and affirm the circuit court's order granting Calen Matsuno's motion for summary judgment.