999 P.2d 230

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Monte Louis YOUNG, Jr.,
Defendant–Appellant.**

No. 21911.

Supreme Court of Hawai'i.

May 24, 2000.

Michael G.M. Ostendorp, Honolulu, on the briefs, for defendant-appellant.

James M. Anderson, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, JJ., and Circuit Judge AMANO *, Assigned by Reason of Vacancy

Opinion of the Court by NAKAYAMA, J.

Defendant-appellant Monte Louis Young, Jr. appeals his conviction of one count of murder in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 707–701.5(1) (1993), and his sentence of life imprisonment without the possibility of parole under HRS § 706–657 (Supp.1998). On appeal, Young argues that the trial court erred in: (1) finding him penally responsible; (2) failing to convict him of manslaughter instead of murder in the second degree; (3) denying his motion to dismiss the complaint or, in the alternative, to strike the enhanced sentencing language from the complaint; and (4) sentencing him to life in prison without the

* Acting Associate Justice Amano, was assigned by reason of the vacancy created by the resignation of Justice Klein, effective February 4, 2000. On May 19, 2000, Simeon R. Acoba, Jr. was sworn-in as associate justice of the Hawai'i Supreme Court. However, Acting Associate Justice Amano remains on the above-captioned case, unless otherwise excused or disqualified.

possibility of parole. We affirm Young's conviction and vacate his enhanced sentence. We hold that one of the findings of fact relied upon by the sentencing court was clearly erroneous. Without the erroneous finding, there is not substantial evidence that Young's attack was "unnecessarily torturous" to the victim, as required by HRS § 706-657, and therefore, the sentencing court erred in sentencing Young to an enhanced sentence. We vacate Young's sentence and remand for re-sentencing.

## I. BACKGROUND

On the morning of May 10, 1997, Young went to the Burger King on the corner of University Avenue and Metcalf Street. Young approached Brian Yonizaki, a Burger King employee who was sweeping the patio, and asked him for some money. After Yonizaki refused, Young swore at him and walked away. Young then retrieved a hammer from his truck. He returned to the Burger King patio, approached Paul Ulbrich, pulled the hammer out from behind his back, and struck Ulbrich on the back of the head. Young repeatedly hit Ulbrich and continued to hit him after he fell to the ground. According to eyewitnesses, Ulbrich did not scream or struggle. After the attack, Young jumped over the wall on the Metcalf Street side of Burger King, discarded the hammer in the parking lot, and fled the scene in his truck. Ulbrich was taken to a hospital and pronounced dead approximately two hours after the attack. According to the testimony at trial, Ulbrich was a stranger to Young prior to the incident.

Young was arrested in connection with Ulbrich's death on May 13, 1997. Stephen Dung, the arresting detective, did not note any concerns about Young's ability to understand what was happening at the time of his arrest. The next day, Detective Dung asked Young to consent to a search of his car. According to Detective Dung's testimony, Young said that he would not sign the consent form "because he thought that he may be mentally incapacitated but he really wasn't sure." Detective Dung asked Young if he understood that he was under arrest for

Ulbrich's murder. Young replied, "Look, I'm not proud of what I did; and the guy's dead; right?" Detective Dung warned Young that he shouldn't make a statement, but Young continued, "There's a lot of circumstances involved that you guys don't understand." Detective Dung then ordered Young to stop and apprised him of his rights. Young requested an attorney. During this time, Young responded appropriately to questions and seemed to understand what was happening.

On May 21, 1997, Young was charged by complaint with murder in the second degree. The complaint also alleged that the murder was "especially heinous, atrocious, or cruel" under HRS § 706-657. On September 10, 1997, Young filed a motion to dismiss the complaint or, in the alternative, to strike the enhanced sentencing language on the ground that the statute was unconstitutional. A hearing was conducted on January 9, 1998 and continued to June 4, 1998, after Young's conviction. The circuit court denied the motion, ruling that HRS § 706-657 was constitutional and that it applied to the facts adduced at trial.[1]

On September 18, 1997, the court appointed Gary Farkas, Ph.D., Arnold Golden, M.D., and Stephen Choy, Ph.D., to examine the defendant and determine his fitness to proceed and penal responsibility. All three concluded that Young was capable of understanding the proceedings against him and assisting in his defense. They also opined that he should not be held penally responsible. Dr. Golden concluded, "In my opinion, the capacity of the defendant to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law was substantially impaired by the above mentioned physical and mental disorders and defects at the time of the alleged conduct." Dr. Choy concluded that "the Defendant was substantially impaired both cognitively and volitionally at the time of the alleged conduct." Dr. Farkas concluded that it was likely that, at the time of the offense, Young's diagnosis was: "AXIS I—Psychotic Disorder, NOS (289.9), rule out Schizophre-

---

1. On appeal, Young does not contest the circuit court's ruling on the statute's constitutionality.

nia, Paranoid Type (295.3) versus Substance–Induced Persisting Psychotic Disorder (292.1). Polysubstance Dependence, by history (304.80)[.] AXIS II—Deferred[.] AXIS III—Status post subarachnoid hemorrhage and temporoparietal contusion, by history[.]" In an order dated November 21, 1997, the court found Young fit to proceed.

In the jury-waived trial, Beatrix–Mona Tanuwidjaya, who was waiting outside for Burger King to open on the morning of the attack, testified that she saw Young speaking to Ulbrich. When she heard a blow, she looked up and saw Young hit Ulbrich with the hammer. She stood up and screamed. Tanuwidjaya testified that Young appeared angry and that his anger seemed to increase as he struck Ulbrich. She also stated that, although Young initially swung the hammer with one hand, he later used both hands.

Yonizaki testified that after he refused to give Young money, he continued to sweep the patio. He heard "about three hits[,]" looked up, and saw Young hitting Ulbrich. Young ordered him to "get in before I kill you," and Yonizaki went inside. Tesiery DeGuzman, a Burger King cashier who was preparing food inside during the incident, testified that she saw Young hit Ulbrich six to eight times.

Chi Cheung Leung testified that he was driving up to the intersection of University Avenue and Metcalf Street when he heard yelling. He looked toward the Burger King and saw Young pushing and yelling at Ulbrich, who did not resist. Later, he saw Young hit Ulbrich in the back of the head and the upper back. As he drove away, he heard three more blows that sounded like "[h]itting the concrete floor."

The parties stipulated to the testimony of two eyewitnesses, Keiko Tanaka and Thomas Bell. Tanaka would have testified that she saw Young strike Ulbrich a couple of times and that, after each blow, Young paused to assess the damage. Bell would have testified that he looked out from his window in the Atherton YMCA when heard a loud noise. He saw Young swinging at something on the ground. Bell thought Young was hitting one of the concrete tables because the impact sounds were so loud. He also heard a high-pitched scream. He saw Young swing three to five times.

Marcus Keep, M.D., who examined Ulbrich at Queen's Hospital, testified that there had been extensive damage to Ulbrich's skull, which was fractured "from the backside . . . all the way from the base, where the spinal cord enters, all the way to the top. It was like a cracked walnut[.]" He also described Ulbrich's injuries as "extremely severe . . . , very disturbing and horrifying[,]" and caused by "significant force[.]"

The defense called each of the doctors on the three-member panel. · All of them testified that Young suffered from some sort of psychosis and, at the time of the offense, lacked the substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law. They also testified that Young was not under the influence of drugs or alcohol at the time of the offense. However, Dr. Choy acknowledged, "[I]t's very unclear which came first, the substance abuse or the psychosis, but . . . both exist."

The defense also called Lisa Eby, Young's live-in girlfriend at the time of the offense. She testified that Young drank about eight beers each night and smoked two joints of marijuana a day. However, when he was being interviewed by the panel members, Young admitted to more excessive use of alcohol and marijuana. Eby said that she and Young had also tried cocaine and crystal methamphetamine, but that from April 19, 1997 to May 7, the last time she saw him, she did not see him "do anything else besides drink or smoke marijuana." According to Eby, after Young suffered a concussion in a fight with some Marines in April 1997, he began to act strangely. In the week before the murder, Young complained that his head was bothering him and his behavior grew worse. Young would mumble to himself and talk nonsense. He also believed that federal agents had him under surveillance and that aliens were after him. Eby testified that Young would lock her in the house when he left and that he once took her to Schofield Barracks because "he wanted to get [her] some protection from the aliens."

The prosecution called Honolulu Police Department Officer Gisele Ruiz as a rebuttal witness. Officer Ruiz was the administrative officer at the receiving desk in the main station on May 8, 1997, when Young was jailed for abuse of a household member. Ruiz testified that Young did not behave in a dangerous manner and did not appear to be hallucinating or delusional. Ruiz also testified that Young was placed in a cell with other prisoners and not in a padded cell for disorderly, psychotic, or insane prisoners. Young was jailed on May 11, 1997 for theft and was again placed in a cell with other prisoners. Ruiz stated that there was no indication in the desk records that Young was hallucinating or having delusions during the second stay.

The prosecution also called Mark Muraki, a crisis worker dealing with the mentally ill at the District Court cellblock. Muraki assessed Young's mental health on May 12, 1997, after Young's arrest for theft. Muraki testified that Young was oriented as to person, time, and place and understood the charges against him. During the interview, Young told Muraki that he had some mental health disabilities, but he denied that these resulted from drug or alcohol abuse. However, based on his education, training, and experience dealing with alcoholics and drug abusers, Muraki suspected that Young was abusing drugs or alcohol. Muraki recommended that he be released on his own recognizance.

Meredith Friedman, Ph.D., a forensic and clinical psychologist, testified for the prosecution. Dr. Friedman prepared a presentence evaluation of Young in 1993 for offenses he was convicted of in California. Dr. Friedman testified to Young's extensive drug use and his history of violent incidents. Young admitted to using LSD fifty times and experiencing hallucinations and some paranoia. Young's father told Dr. Friedman that Young had a ten-year history of methamphetamine use. Dr. Friedman's tests indicated that Young was not schizophrenic and that his characterological problems were consistent with long-term methamphetamine use. In her opinion, Young's psychosis was caused by drugs and alcohol. If the DSM–IV guidelines had been available at that time, her diagnosis would have been a substance-induced delusional disorder. On cross-examination, Dr. Friedman admitted that, at the time she examined Young, he was taking anti-psychotic medication. She also admitted that, at one point in her report, she indicated that "it is unclear if this man suffers from an underlying schizophrenic process that was merely exacerbated by his substance abuse, or if years of using drugs and drinking have resulted in a disorder that mimics paranoid schizophrenia."

The prosecution's final rebuttal witness was Harold Hall, Ph.D., a forensic and clinical neuropsychologist. Dr. Hall testified that, in his opinion, the diagnoses of the three members of the panel were flawed because they: (1) did not attribute the impaired volitional capacity to a mental disorder; (2) did not differentiate between substance abuse and the effects of substances from alleged psychosis; (3) did not take into account personality/character disorders; and (4) exaggerated the effects of Young's head injury. Dr. Hall testified that his review of Young's tests indicated that the "brain injury was mild at most and was not translated into neuropsychological deficiencies, problems and loss of control and other factors." Dr. Hall opined that Dr. Friedman's tests of Young showed no indication of schizophrenia.

Dr. Hall also testified regarding the effects of methamphetamine use. Dr. Hall testified that methamphetamine can cause psychotic behaviors, hallucinations, and delusions similar to those experienced by schizophrenics. These effects can last for weeks, even months, after the person has stopped abusing the drug. Dr. Hall also testified that clinicians have observed a "cross-reverse tolerance" in methamphetamine users; they are sensitive to other chemicals, such as caffeine, alcohol, marijuana, or cocaine. These other chemicals trigger the "methamphetamine psychosis." Dr. Hall opined that a methamphetamine user still possesses an inherent ability for self-control and can choose whether or not to take the drug, or other drugs, and can decide whether or not to act violently.

On May 7, 1998, the trial court entered its findings of fact and conclusions of law, adjudging Young guilty as charged. The court found that Young voluntarily drank up to twelve beers and voluntarily smoked up to three marijuana joints per day in the weeks leading up to the incident. The court also found that Young had been using other illegal drugs during that time, that psychosis caused by drugs can last for months after drug use has stopped, and that methamphetamine psychosis can be triggered by the use of other substances. The court further found that, at the time of the offense, Young: (1) was not schizophrenic; (2) suffered from a mental disease or defect that was caused by drugs and/or alcohol; and (3) was not suffering from brain damage or impaired neurological functioning as a result of the April 1997 incident. The court found that Young's mental disease or defect did not cause him to lack the substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

On June 4, 1998, the circuit court held a hearing on Young's motion to dismiss the complaint or, in the alternative, to strike the enhanced sentencing language from the complaint. The court entered its findings of fact and conclusions of law in an order denying the motion on June 16, 1998. The court found:

1. This case involved Defendant's unprovoked attack on a stranger which resulted in the death of Paul Ulbrich.

2. The Defendant attacked Mr. Ulbrich with both the claw end and the blunt end of a hammer.

3. At times Defendant used one hand, and at times he used both hands to wield the hammer.

4. Between hammer blows, Defendant paused to assess the damage to Mr. Ulbrich.

5. Defendant struck numerous, repeated blows to the head and shoulders of Mr. Ulbrich.

6. The sounds of the hammer blows could be heard at a distance of over twenty (20) feet, over the noise of a car engine.

7. The sounds of Mr. Ulbrich's screams could be heard at a considerable distance as testified to by stipulation.

Based upon these findings, the court found that the murder was "especially heinous, atrocious and cruel, manifesting exceptional depravity on the part of Defendant[,]" and that HRS § 706–657 was applicable. The court also concluded that HRS § 706–657 was constitutional and did not violate Young's right against cruel and unusual punishment or his right to due process. On September 15, 1998, the court entered its judgment of guilt and sentence, imposing a term of life in prison without the possibility of parole.

Young thereafter timely appealed. On appeal, he argues that the trial court erred in finding him guilty of murder in the second degree and that, even if the State proved its case for murder in the second degree, he should have been convicted of manslaughter because he acted under an extreme mental or emotional disturbance. Young also argues that the court erred in denying his motion to dismiss the complaint[2] and in imposing an enhanced sentence.

## II. DISCUSSION

### A. Standard of review

[E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

*State v. Birdsall,* 88 Hawai'i 1, 8, 960 P.2d 729, 736 (1998) (quoting *State v. Quitog,* 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997)) (brackets in original).

A trial court's findings of fact will not be disturbed on appeal unless they are clearly erroneous. *State v. Ortiz,* 91 Hawai'i 181, 189, 981 P.2d 1127, 1135 (1999). Conclu-

---

2. *See supra* note 1.

sions of law are reviewed under the right/wrong standard. *Id.*

Sentencing matters are typically reviewed for an abuse of discretion. *Barnett v. State*, 91 Hawai'i 20, 26, 979 P.2d 1046, 1052 (1999) (quoting *State v. Davia*, 87 Hawai'i 249, 253–54, 953 P.2d 1347, 1351–52 (1998)). However, in *State v. Janto*, 92 Hawai'i 19, 33, 986 P.2d 306, 320 (1999), we held that the trier of fact must determine, beyond a reasonable doubt, whether the murder was "especially heinous, atrocious, or cruel." On appeal, the standard should be whether there is substantial evidence supporting the finding that the murder was "especially heinous, atrocious, or cruel."

### B. The trial court did not err in finding Young guilty of second degree murder.

On appeal, Young argues that he should not have been found penally responsible because: (1) the three-member panel established that he was suffering from a psychosis that rendered him cognitively and volitionally impaired; (2) he suffered from "pathological intoxication"; (3) a drug induced mental illness, in and of itself, can constitute a defense to a criminal charge; and (4) his prior head injuries resulted in brain damage that rendered him substantially impaired. In the alternative, he argues that he was acting under an "extreme mental or emotional disturbance" and that he should have been convicted of manslaughter instead of murder in the second degree.

#### 1. Penal responsibility

HRS § 704–400 (1993) provides:

(1) A person is not responsible, under this Code, for conduct if at the time of the conduct as a result of physical or mental disease, disorder, or defect the person lacks substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform the person's conduct to the requirements of law.

(2) As used in this chapter, the terms "physical or mental disease, disorder, or defect" do not include an abnormality manifested only by repeated penal or otherwise anti-social conduct.

Pursuant to HRS § 702–230(3) (1993), intoxication alone is not a "physical or mental disease, disorder, or defect." However, pathological intoxication can be a defense "if by reason of such intoxication the defendant at the time of the defendant's conduct lacks substantial capacity either to appreciate its wrongfulness or to conform the defendant's conduct to the requirements of law." HRS § 702–230(4) (1993).

Young, at trial and on appeal, acknowledged that the State adduced *prima facie* evidence proving the elements of the charged offense. However, Young argued that he was not penally responsible because he was cognitively and volitionally impaired due to a psychosis, which was possibly caused by schizophrenia. The State's rebuttal witnesses opined that Young did not suffer from schizophrenia and that his psychosis was drug-related. The trial court found that the prosecution's witnesses were more credible than the defense's and that the defense's witnesses lacked complete information about Young's condition. Therefore, the trial court found that Young's mental disease, disorder, or defect was caused by substance abuse and that it did not cause him to lack the substantial capacity to appreciate the nature of his conduct or to conform his conduct to the law. The trial court's finding that Young was penally responsible will be affirmed as long as there was substantial evidence to support it. *See* HRS § 704–402(1) (1993) (providing that HRS § 704–400 is an affirmative defense); HRS § 701–115(2)(b) (1993) (stating that affirmative defenses must be proved by the defendant by a preponderance of the evidence); *see also, e.g., State v. Reed*, 77 Hawai'i 72, 82, 881 P.2d 1218, 1228 (1994) (stating that there must be substantial evidence to support the conclusion that the defendant did not prove an affirmative defense by a preponderance of the evidence).

We have previously stated that:

The findings of an expert are always entitled to serious consideration by the trier of fact, but the weight the factfinder gives to expert evidence is dependent upon its own assessment of the facts upon which the expert's opinion is predicated, upon the validity of the expert's assumptions, upon

the reliability of the diagnostic and analytical processes by which the expert arrived at his determinations, and upon all other facts and circumstances bearing upon the issue.

*State v. Freitas,* 62 Haw. 17, 23, 608 P.2d 408, 412 (1980) (citing *United States v. McCracken,* 488 F.2d 406 (5th Cir.1974)).

Drs. Friedman and Hall testified extensively about Young's substance abuse and its effects. Dr. Golden testified that, although he considered substance abuse to be a potential factor, he concluded that it was not a significant factor. This conclusion was based in part on Young's denial of a substance abuse problem. In addition, both Drs. Choy and Farkas testified that they had not ruled out the possibility that Young's psychosis was caused by substance abuse. Based on the evidence adduced at trial, it was not clearly erroneous for the trial court to find the testimony of the prosecution's witnesses to be more credible than that of the defense's witnesses.

 Young also argues that he was not penally responsible because of pathological intoxication. Although the evidence established that Young had a history of polysubstance abuse, it does not necessarily constitute pathological intoxication.[3] Young did not argue at trial that he suffered from pathological intoxication, and the trial court made no finding of fact on the issue. Thus, Young waived the argument of penal irresponsibility by reason of pathological intoxication. Even if this issue had properly been preserved for appeal, the evidence clearly establishes that Young's long-term, voluntary, polysubstance abuse does not meet the HRS § 702–230(5)(c) definition of pathological intoxication, *see supra* note 3.

 Young also argues that, even if his intoxication was not pathological, we should hold that a drug-induced or exacerbated mental illness, in and of itself, constitutes a criminal defense as a matter of law. The issue of a preexisting mental illness that is aggravated by drug abuse is not presented in

this case. The trial court found that Young's mental disease, disorder, or defect was caused by substance abuse. We decline to adopt Young's argument that a drug-induced mental illness is a defense because to do so would be contrary to the legislative intent underlying HRS §§ 702–230 and 704–400.

In 1986, the legislature added subsection (1) to HRS § 702–230, specifically prohibiting self-induced intoxication as a defense except in limited circumstances. 1986 Haw. Sess. L. Act 325, § 2 at 687–88. The conference committee stated that it "believes that when a person chooses to drink, that person should remain ultimately responsible for his or her actions." Conf. Comm. Rep. No. 36, in 1986 House Journal, at 928. HRS § 702–230(3) provides that intoxication alone cannot negate penal responsibility under HRS § 704–400. To adopt the rule suggested by Young would be contrary to this statutory scheme. If an intoxicated person cannot escape ultimate responsibility for his actions, neither should a defendant who chronically engages in substance abuse. Only in the instance when the intoxication causes the person to lack the ability to form the requisite state of mind is intoxication a defense. The same is also true of someone with a drug-induced mental illness.

 Finally, Young argues that he suffered brain damage during the April 1997 fight and that this brain damage constitutes a physical disease under HRS § 704–400(1) (1993). The trial court found that Young "did not suffer brain damage, nor was his neurological functioning impaired, as a result of being punched in April, 1997." Based on the record on appeal, this finding was not clearly erroneous. Therefore, the trial court did not err in finding Young to be penally responsible.

### 2. Extreme mental or emotional distress manslaughter

Young argues that, if he was penally responsible, he should have been convicted of manslaughter because, at the time of the offense, he was acting "under the influence of

---

**3.** HRS § 702–230(5)(c) (1993) defines "pathological intoxication" as "intoxication grossly excessive in degree, given the amount of the intoxi-cant, to which the defendant does not know the defendant is susceptible and which results from a physical abnormality of the defendant."

extreme mental or emotional disturbance." HRS § 707–702(2) (1993) provides:

> In a prosecution for murder in the first and second degrees it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he caused the death of the other person, under the influence of extreme mental or emotional disturbance *for which there is a reasonable explanation.* The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he believed them to be.

(Emphasis added.)

In its findings of fact and conclusions of law, the trial court did not address Young's argument that he should be convicted of manslaughter by reason of extreme mental or emotional disturbance (EMED). However, the court convicted Young of murder in the second degree, implicitly rejecting Young's EMED claim.

██ EMED manslaughter "has been characterized as 'voluntary manslaughter [because it] involves the intentional [or knowing] killing of another while under the influence of a reasonably induced [extreme mental or] emotional disturbance ... *causing a temporary loss of normal self-control.*'" *State v. Pinero,* 70 Haw. 509, 524, 778 P.2d 704, 714 (1989) (quoting W.R. LaFave & A. Scott, Jr., *Criminal Law* § 76, at 573 (1972)) (alterations in original) (emphasis added). There was substantial evidence adduced at trial that Young's actions during the attack were indicative of self-control. For example, he left the Burger King patio to retrieve the hammer from his truck before returning and attacking Ulbrich, he paused to assess the damage to Ulbrich's head after each blow, he threatened Yonizaki, who witnessed the attack, and he discarded the hammer as he fled the scene. Evidence of such calculated actions, when considered in conjunction with the testimony of the expert witnesses, provided substantial evidence disproving Young's EMED claim.

Young argues that "[t]here is nothing in HRS [§ ] 707–702 ... that [states] the accused must 'lose control' or more specifically, that the trier of fact must consider whether the accused's 'extreme mental or emotional distress' resulted in a loss of control." However, we have held that a loss of control is "a significant, even determining, factor" in evaluating an EMED claim. *State v. Matias,* 74 Haw. 197, 204, 840 P.2d 374, 378 (1992). *See also State v. Perez,* 90 Hawai'i 65, 976 P.2d 379 (1999). Implicit in Young's argument is a contention that, even if he did not display a visible loss of control, he was still acting under extreme mental or emotional distress. If this were true, it was incumbent upon him to adduce evidence at trial to establish that a loss of control existed although it was not visible. In *Perez,* we stated:

> It is undoubtedly true ... that, under some circumstances, persons experiencing a loss of self-control, resulting from being under the influence of an extreme mental or emotional disturbance, may behave in an outwardly calm or even semi-catatonic state. That being the case, a defendant is free to adduce expert testimony or other evidence pertaining to his or her state of mind offense in order to rebut the prosecution's contention that outward calm was evidence of self-control.

90 Hawai'i at 75, 976 P.2d at 389.

██ The testimony of Drs. Golden, Choy, and Farkas focused on their diagnoses of Young's psychotic disorder. There is little evidence in the record specifically addressing the question whether Young lacked self-control. Dr. Golden testified that the fact that Young attacked Ulbrich in broad daylight, in front of several witnesses, indicated that Young did not plan the attack. However, a lack of planning, in itself, does not establish a lack of self-control. Further, Dr. Farkas testified that Young was not acting "in an automatic fashion" at the time of the incident.

Taken in the light most favorable to the prosecution, there was substantial evidence adduced at trial that Young was not experiencing a loss of control during the attack and was not acting under extreme mental or emotional distress. Thus, the trial court did not err in refusing to convict Young of the included offense of manslaughter.

## C. The circuit court issued an erroneous finding of fact and the sentencing court committed reversible error in imposing an enhanced sentence.

On appeal, Young argues that the sentencing court relied upon "an erroneous recollection of the evidence" and that, therefore, the court erred in denying his motion to dismiss the complaint and in imposing an enhanced sentence. We hold that the circuit court erred in finding that the victim's screams could be heard at a considerable distance. We also hold that HRS § 706–657 requires the State to prove, beyond a reasonable doubt, that the victim suffered unnecessary torture and that the defendant intentionally or knowingly inflicted unnecessary torture upon the victim.

### 1. Sufficiency of the complaint

■ In *State v. Janto*, 92 Hawai'i 19, 33, 986 P.2d 306, 320 (1999), we stated that whether the murder was "especially heinous, atrocious, or cruel" was an "intrinsic" factor and must be alleged in the complaint. Young argues that he did not receive sufficient notice of the grounds upon which HRS § 706–657 was being invoked because the complaint merely quoted the language of the statute. Young apparently argues that the complaint should include allegations of the specific facts upon which the State intends to rely to prove that the murder was "especially heinous, atrocious or cruel." The complaint in this case provided Young with sufficient notice that the State would seek an enhanced sentence if he were convicted. The State is not required to allege specific facts that upon which it intends to rely. However, the enhanced sentence must be vacated because there was not substantial evidence to support the court's finding that the murder was "especially heinous, atrocious, or cruel."

### 2. Erroneous finding of fact

■ In the circuit court's findings of fact and conclusions of law and order denying Young's motion, the court found "[t]he sounds of Mr. Ulbrich's screams could be heard at a considerable distance as testified to by stipulation." During the sentencing proceedings, the court emphasized this point,

stating "his screams could be heard, so this was not a painless death." Young argues that the circuit court's finding was clearly erroneous.

The stipulation the court referred to actually read "[t]hat Thomas Bell heard a high-pitched scream while the Defendant was swinging the object[.]" Bell apparently heard only a single scream, not the continuous screams of someone being brutally attacked. Also, the fact that it was a high-pitched scream suggests that the scream Bell heard did not come from the victim, but from Beatrix–Mona Tanuwidjaya, who screamed when she saw Young hitting Ulbrich. However, most telling is that all of the eyewitnesses at trial testified that Ulbrich never screamed during the attack. Thus, we hold that the circuit court's finding that the victim's screams could be heard at a considerable distance was clearly erroneous.

### 3. "Especially heinous, atrocious, or cruel"

■ HRS § 706–657 provides: "The court may sentence a person who has been convicted of murder in the second degree to life imprisonment without possibility of parole under section 706–656 if the court finds that the murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity[.]" Because all murders are arguably heinous, atrocious, or cruel, there must be a "principled way to distinguish" those cases in which an enhanced sentence is imposed from those in which it is not. *See Godfrey v. Georgia*, 446 U.S. 420, 433, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, *which is to be obtained primarily from the language contained in the statute itself.* And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. . . .

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool. *State v. Dudoit,* 90 Hawai'i 262, 266, 978 P.2d 700, 704 (1999) (quoting *Gray v. Administrative Director of the Court,* 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997)) (emphasis added) (alterations in original).

 HRS § 706–657 defines "especially heinous, atrocious, or cruel, manifesting exceptional depravity" as "a conscienceless or pitiless crime which is unnecessarily torturous to a victim[.]" In the context of an enhanced sentencing statute for murder in the second degree, "unnecessarily torturous" clearly encompasses more than the infliction of a fatal injury. The qualifier "to a victim" indicates that the determination of whether the murder was "unnecessarily torturous" must be made from the perspective of the victim. We adopt the following definition of

unnecessary torture: the infliction of extreme physical or mental suffering, beyond that which necessarily accompanies the underlying killing.[4]

 HRS § 706–657 does not expressly refer to the defendant's state of mind; it states that the murder must be a "conscienceless or pitiless crime." The question whether the defendant felt guilt or pity, however, necessitates an inquiry as to the defendant's state of mind. In the context of an enhanced sentencing statute, a "conscienceless or pitiless crime" indicates a requisite state of mind beyond that necessary to prove the underlying offense. The phrase "conscienceless or pitiless crime" implies that the defendant was aware of and disregarded the fact that his or her actions were unnecessarily torturous to the victim.[5] This interpretation is consistent with the intent of the legislature to address "situations where the circumstances demonstrate that the individual who committed the crime is exceptionally depraved, and hence should not be considered eligible for parole." Stand. Comm. Rep. No. 1171, in 1993 House Journal, at 1470.

4. The dissent argues that the term "unnecessarily torturous" is essentially circular because all murder involves torture and all torture is unnecessary. Under the dissent's view, this term does not provide a substantive standard for the imposition of an enhanced sentence. Therefore, the dissent contends that the emphasis should be on the depravity of the defendant over the subjective suffering of the victim.

Initially, we note that the "unnecessarily torturous" language has been approved by the United States Supreme Court. In *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the Court upheld a Florida statute that authorized the imposition of the death penalty if the crime was "especially heinous, atrocious, or cruel." The Court stated:
[The Florida Supreme Court] has recognized that while it is arguable "that all killings are atrocious, ... (s)till, we believe that the Legislature intended something 'especially' heinous, atrocious or cruel when it authorized the death penalty for first degree murder." As a consequence, the court has indicated that the ... provision is directed only at "the conscienceless or pitiless crime which is *unnecessarily torturous to the victim."* State v. Dixon, 283 So.2d [1,] 9 [ (Fla.1973) ]. We cannot say that the provision, as so construed, provides inadequate guidance to those charged with the duty

of recommending or imposing sentences in capital cases.
428 U.S. at 255–56, 96 S.Ct. 2960 (emphasis added) (some citations omitted) (some alterations in original).
We agree with the dissent that torture is never "necessary." However, HRS § 706–657 addresses only the extreme cases involving severe physical or mental suffering.

5. The dissent argues that "[t]he state of mind required by HRS § 706–657 is that Defendant *recklessly disregarded* the substantial [risk] that his/her actions would result in torture to the victim." Dissent at —— n.3, 999 P.2d at 247 n.3 (emphasis in original). However, the underlying offense, murder in the second degree, requires an intentional or knowing state of mind. HRS § 707–701.5(1) (1993). To hold that the state of mind required by the enhanced sentencing statute is recklessness would be inconsistent with the underlying offense. Further, the dissent agrees that the state of mind requirement is inferred from the "conscienceless or pitiless crime" language. Insofar as these terms indicate an absence of guilt, remorse, and compassion, it is illogical to argue that a person can be recklessly conscienceless or pitiless. Thus, the state of mind required by HRS § 706–657 must be intentional or knowing.

**236**

■ We hold that the prosecution must prove beyond a reasonable doubt that the victim suffered unnecessary torture and that the defendant intentionally or knowingly inflicted unnecessary torture on the victim.[6] These factors provide a "principled way to distinguish" between murders that are "especially heinous, atrocious, or cruel" and those that are not.[7]

■ In the present case, the circuit court erroneously found that Ulbrich's screams could be heard at a considerable distance. Young argues that, without the erroneous finding, the court erred in imposing an enhanced sentence under HRS § 706–657 because the prosecution did not prove that the murder was unnecessarily torturous to Ulbrich. We agree.

The other factors that the sentencing court considered were: the attack was unprovoked; Young used the claw end and the blunt end of the hammer; Young swung the hammer with one hand and later with two hands; Young paused between blows to assess the damage; Young hit Ulbrich numerous times; and the sound of the hammer blows was very loud. In addition, the record shows that Young's head injuries were severe; his head was fractured like a "cracked walnut." These factors are relevant as circumstantial evidence of Young's state of mind.

■ However, the record does not support a finding that Ulbrich suffered unnecessary torture. The sentencing court noted that there was "evidence that there are defensive injuries to Mr. Ulbrich, in particular State's Exhibit 32 that showed some injuries to his hands...." The presence of such defensive injuries would be relevant to the question whether the victim was aware of the attack and whether he suffered unnecessary torture. However, the record on appeal does not support the court's characterization of Young's injuries.

**6.** The dissent argues that an enhanced sentence should be imposed "where circumstances of the crime indicate that defendant was aware of and disregarded the likelihood that his or her actions would result in torture to the victim, and that the circumstances of the crime allow a reasonable inference that the victim suffered torture." Dissent at ─ ─ ─ ─, 999 P.2d at 248. Because the legislative history of HRS § 706–657 focuses solely on the depravity of the defendant, the dissent argues that this court should interpret the statute with a similar emphasis.

HRS § 706–657 explicitly states that "the phrase 'especially heinous, atrocious, or cruel, manifesting exceptional depravity' means a conscienceless or pitiless crime *which is unnecessarily torturous to a victim.*" (Emphasis added.) Although the legislative history does not refer to the suffering of the victim, the plain language of the statute clearly imposes this requirement. Our holding, that HRS § 706–657 requires that the prosecution prove both that the defendant intentionally or knowingly inflicted, and the victim in fact suffered, unnecessary torture, is consistent with the legislature's intent, as evidenced by the terms of the statute together with the legislative history.

Further, there is nothing in the language of the statute that suggests that the victim's suffering is either less important than, or an automatic consequence of, the conscienceless or pitiless nature of the crime. In *Janto*, we held that the prosecution must prove that the murder was "especially heinous, atrocious, or cruel" beyond a reasonable doubt. 92 Hawai'i at 35, 986 P.2d at 322. Because both the defendant's state of mind and the victim's suffering are elements of the "especially heinous, atrocious, or cruel" nature of the crime, both must be proven by the prosecution beyond a reasonable doubt. By arguing that the victim's suffering can be inferred from the depravity of the defendant's actions, the dissent effectively subsumes the "unnecessarily torturous to the victim" language into the "conscienceless or pitiless crime" language. This violates the fundamental principle of statutory construction that "courts are bound to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute." *In re Doe*, 90 Hawai'i 246, 250, 978 P.2d 684, 688 (1999) (quoting *State v. Kaakimaka*, 84 Hawai'i 280, 289–90, 933 P.2d 617, 626–27 (1997)).

**7.** The dissent emphasizes that, in enacting HRS § 706–657, the legislature intended to give sentencing courts the discretion to impose a sentence of life imprisonment without the possibility of parole in appropriate cases of murder in the second degree. However, as we held in *Janto*, this discretion is limited by the defendant's rights to due process and a jury trial. 92 Hawai'i at 33–34, 986 P.2d at 320–21. Thus, the finder of fact must determine that the murder was "especially heinous, atrocious, or cruel" before the sentencing court, in its sound discretion, may impose an enhanced sentence. We have not precluded the exercise of this discretion by holding that the prosecution to prove, beyond a reasonable doubt, that the defendant intentionally or knowingly inflicted unnecessary torture and that the victim suffered unnecessary torture.

The medical examiner, Bani Win, M.D., performed the autopsy on Ulbrich. The parties stipulated to Dr. Win's testimony and the autopsy report. The autopsy report stated that "[t]here are punctate abrasions on the dorsum of the right hand over the first carpophalangeal joints of the 3rd, 4th and 5th fingers and interphalangeal joints of the 3rd, 4th and 5th fingers." HPD evidence specialist Errol Kilantang was present during the autopsy and took photographs of the decedent's body. He identified the photograph entered as State's Exhibit 32 as "a photograph showing injuries to the right hand, the back side of the decedent's right hand, including the fingers." The photo was taken before the autopsy. Neither the stipulations nor the testimony at trial specifically identified the injuries to Ulbrich's hands as defensive injuries.

In addition, none of the eye witnesses to the attack testified that they saw Ulbrich try to shield himself from Young's blows. Beatrix–Mona Tanuwidjaya testified as follows:

Q: And what did [Ulbrich] do after he was struck the first time?

A: Didn't do anything.

. . . .

Q: Did you at any time see [Ulbrich] raise his arms or hit or try to strike—

A: No.

Q: —the defendant?

A: No.

Chi Cheung Leung testified:

Q: One—was it both people pushing each other, or only one was doing the pushing?

A: Only one was doing the pushing.

Q: What was the other person doing?

A: He didn't fight back at all. He kind of was passive.

Q: Okay.

A: He didn't do anything.

Thus, we hold that the sentencing court's finding that Ulbrich incurred defensive injuries was clearly erroneous.

Based upon our review of the entire record on appeal, the only evidence indicating that Ulbrich may have suffered unnecessary torture was the testimony of Brian Yonizaki. Yonizaki testified, "I heard about three—I think about three hits [to Ulbrich], before [he] fell down bleeding." This suggests that Ulbrich was not rendered unconscious immediately. However, Tesiery DeGuzman testified that Ulbrich fell to the ground right away, after the first blow. DeGuzman testified that she saw the attack from the beginning, from the moment Young took the hammer from behind his back. None of the other witnesses testified regarding the point at which Ulbrich fell to the ground. The circuit court therefore found only that Young "struck numerous, repeated blows to the head and shoulders of Mr. Ulbrich[,]" without distinguishing between blows that were struck before Ulbrich fell to the ground and those that were struck after he fell. We hold that the evidence adduced at trial did not satisfy the prosecution's burden of proving, beyond a reasonable doubt, that the victim suffered unnecessary torture.[8]

The dissent argues that the present case proves that our dual requirement produces "absurd results" because, "[i]nasmuch as a murder victim is, by definition, deceased, it is unclear what type of evidence would support an enhanced sentence under HRS § 706–657." Dissent at ——, 999 P.2d at 249. However, the present case provides clear examples of what types of evidence would support an enhanced sentence. Had the circuit court been correct in its findings that the victim's screams could be heard at a considerable distance and that the victim suffered defensive wounds, such findings would support a further finding of unnecessary torture. In the present case, there were several eyewitnesses to the murder.[9] The evidence

---

8. In so holding, we do not require that the unnecessary torture factor be proven by direct evidence. A jury may infer that the victim suffered unnecessary torture based upon circumstantial evidence, if the circumstantial evidence is sufficient to convince the jury, beyond a reasonable doubt, that the murder was "especially heinous, atrocious, or cruel."

9. The dissent argues that, where there are no eyewitnesses to a murder, it may be "nearly impossible" to prove that the victim suffered unnecessary torture. Dissent at ——, 999 P.2d at 249. As we indicated in footnote 8, *supra*, unnecessary torture may be proven through circumstantial evidence. Where there are no eyewitnesses, the murder itself must be proven

adduced at trial indicates that they did not observe the victim suffering unnecessary torture.

The dissent further argues that, because Ulbrich was not pronounced dead until two hours after the attack, the trier of fact could have concluded that Ulbrich suffered some sort of torture during that time. However, Dr. Keep testified that his immediate impression of Ulbrich was that he "was either going to die very soon or was already brain dead." He also testified that his examination of Ulbrich "revealed there was no response to very deep pain." Based on Dr. Keep's medical observations of Ulbrich, it cannot be said that Ulbrich suffered unnecessary torture between the time he was brought to the emergency room and the time he was pronounced dead.

Our review of the entire record on appeal indicates that the trial court's findings of fact regarding whether Ulbrich screamed or incurred defensive wounds were clearly erroneous and that there was not substantial evidence that Ulbrich suffered unnecessary torture. Therefore, we hold that the prosecution did not satisfy its burden of proving, beyond a reasonable doubt, that the murder was "especially heinous, atrocious, or cruel." Accordingly, the circuit court erred in imposing an enhanced sentence under HRS § 706–657.

## III. CONCLUSION

For the foregoing reasons, we affirm Young's conviction. However, we vacate his sentence of life imprisonment without the possibility of parole and remand the case for resentencing without the enhancement.

Concurring and Dissenting Opinion by RAMIL, J. with whom MOON, C.J., Joins.

I concur in part and dissent in part. In my view, the circumstances of this case warrant the imposition of an enhanced sentence under HRS § 706–657.

## I. FACTS

The facts of this case indicate that Defendant stood in the area where Paul Ulbrich was sitting. As Ulbrich got up to leave, Defendant, without any provocation, took a large construction hammer out of his back pocket, followed Ulbrich, and hit Ulbrich with the hammer with tremendous force. Defendant struck Ulbrich on his back and head. After the first hit, Ulbrich fell face forward onto the concrete deck. Defendant, clutching the hammer with both hands, struck Ulbrich three more times on the head and back. Defendant continued to bludgeon Ulbrich's back and skull with both the claw end and the blunt end of the hammer. Defendant would pause after each blow and assess the injuries to Ulbrich. A student driving around the corner fronting Burger King heard the sounds of the blows over the noise from his car's engine and radio twenty to twenty-five feet away. Defendant then fled the scene and left Ulbrich for dead. The police found Ulbrich, bloodied and brain-exposed, lying where he had fallen. Ulbrich was still alive, making a gurgling sound from his mouth. Ulbrich was taken to Queen's Medical Center where he lived for two more hours before dying.

Despite these circumstances exhibiting depravity, the Majority insists that the circuit court, as finder of fact, erred in finding that the murder was "especially heinous, atrocious, or cruel" simply because "the circuit court's finding that the victim's screams could be heard at a considerable distance" was not supported by sufficient evidence. The Majority arrives at its holding by interpreting the plain language of HRS § 706–657 to require proof that the victim of a crime actually suffered "unnecessary torture" in order to apply the enhanced sentencing provisions. In so doing, the Majority has frustrated the underlying intent of the legislature in enacting HRS § 706–657, which was to give judges discretion to impose a life sentence without parole where the "circumstances [of a killing] demonstrate that the individual who committed the crime is exceptionally depraved, and hence should not be considered

through circumstantial evidence. Much of the same circumstantial evidence used to prove the

elements of the crime can also be used to prove that it involved unnecessary torture.

eligible for parole." Our foremost obligation is to ascertain and give effect to the intent of the legislature in the construction of a statute. *See infra* pp. 239–240, 999 P.2d pp. 245–246. In this case, I disagree that the language of HRS § 706–657 is as plain and unambiguous as the Majority suggests. Therefore, I do not believe that we should be so eager to frustrate the clear legislative intent to give the circuit court discretion to impose a life sentence without parole under HRS § 706–657 where the circumstances undoubtedly demonstrate exceptional depravity on the part of a defendant.

## II. *Our Foremost Obligation In Statutory Construction*

I have recently expressed the view that

[a]bsent constitutional obstacles, we have long recognized that our foremost obligation in construing a statute is to ascertain and give effect to the intent . . . of the legislature to the fullest degree. *See CARL Corp. v. State, Dept. of Educ.*, 85 Hawai'i 431, 459, 946 P.2d 1, 29 (1997); *see also Kim v. Contractors License Bd.*, 88 Hawai'i 264, 269, 965 P.2d 806, 811 (1998) (quoting *Korean Buddhist Dae Won Sa Temple of Hawaii [v. Sullivan]*, 87 Hawai'i 217, 229–30, 953 P.2d 1315, 1327–28 (1998) (quoting *State v. Cullen*, 86 Hawai'i 1, 8–9, 946 P.2d 955, 963–64 (1997))); *Kawamata Farms, Inc. v. United Agri Products*, 86 Hawai'i 214, 255, 948 P.2d 1055, 1096 (1997) (quoting *State v. Wells*, 78 Hawai'i 373, 376, 894 P.2d 70, 73, *reconsideration denied*, 78 Hawai'i 474, 896 P.2d 930 (1995)); *Macabio v. TIG Ins. Co.*, 87 Hawai'i 307, 311, 955 P.2d 100, 104 (1998) (citing *State v. Aluli*, 78 Hawai'i 317, 320, 893 P.2d 168, 171 (1995)); *Richardson v. City and County of Honolulu*, 76 Hawai'i 46, 68–69, 868 P.2d 1193, 1215–16 (Klein, J., dissenting), *reconsideration denied*, 76 Hawai'i 247, 871 P.2d 795 (1994) (citing *Methven–Abreu v. Hawaiian Ins. & Guar. Co., Ltd.*, 73 Haw. 385, 392, 834 P.2d 279, 284, *reconsideration denied*, 73 Haw. 625, 838 P.2d 860 (1992) (citation omitted)). Therefore, notwithstanding the rules of statutory construction, our paramount objective in construing a statute is to ascertain and give effect to the intent of the legislature.

Although it is true that we obtain the intent of the legislature primarily from the language of the statute itself, we have rejected an approach to statutory construction which limits our inquiry to the bare words of a statute. *Four Star Ins. Agency, Inc. v. Hawaiian Elec. Indus., Inc.*, 89 Hawai'i 427, 431, 974 P.2d 1017, 1021 (1999) (quoting *Bragg v. State Farm Mut. Auto. Ins. Co.*, 81 Hawai'i 302, 306, 916 P.2d 1203, 1207 (1996)) (quoting *Sato v. Tawata*, 79 Hawai'i 14, 17, 897 P.2d 941, 944 (1995)). Instead, we must consider the words of a statute in the context of the entire statute and construe it in a manner consistent with its purpose. *See Shipley v. Ala Moana Hotel*, 83 Hawai'i 361, 364–65, 926 P.2d 1284, 1287–88 (1996) (quoting *State v. Toyomura*, 80 Hawai'i 8, 19, 904 P.2d 893, 904 (1995)); *see also Mendes v. Hawaii Ins. Guar. Ass'n*, 87 Hawai'i 14, 17, 950 P.2d 1214, 1217 (1998) (citing *Mathewson v. Aloha Airlines, Inc.*, 82 Hawai'i 57, 71, 919 P.2d 969, 983 (1996)).

In considering the meaning of the words in a statute, "[t]he legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction[,] and illogicality." *Kim*, 88 Hawai'i at 270, 965 P.2d at 812 (quoting *State v. Arceo*, 84 Hawai'i 1, 19, 928 P.2d 843, 861 (1996) (citation and internal quotation marks omitted)); *see also* HRS § 1–15(3) (1993) (providing that "[e]very construction which leads to an absurdity shall be rejected"). To determine whether an interpretation of a statute will yield an absurd result, we may consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it . . . to discover its true meaning." HRS § 1–15(2) (1993). Further, "[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." *State v. Ake*, 88 Hawai'i 389, 395, 967 P.2d 221, 227 (1998) (quoting HRS § 1–16 (1993)). Indeed,

when aid to construction of the meaning of words, as used in the statute, is avail-

able, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination. *Thus, the plain language rule of statutory construction, does not preclude an examination of sources other than the language of the statute itself even when the language appears clear upon perfunctory review.* Were this not the case, a court may be unable to adequately discern the underlying policy which the legislature seeks to promulgate and, thus, would be unable to determine if a literal construction would produce an absurd or unjust result, inconsistent with the policies of the statute.

*Four Star,* 89 Hawai'i at 431, 974 P.2d at 1021 (quoting *Bragg,* 81 Hawai'i at 306, 916 P.2d at 1207 (quoting *Sato,* 79 Hawai'i at 17, 897 P.2d at 944)) (emphasis added); *see also Kahana Sunset Owners Ass'n v. Maui County Council,* 86 Hawai'i 132, 134, 948 P.2d 122, 124 (1997) (quoting *Crompton v. Tern Corp.,* 83 Hawai'i 1, 6, 924 P.2d 169, 175 (1996) (citation omitted)). *State v. Dudoit,* 90 Hawai'i 262, 276–77, 978 P.2d 700, 714–15 (1999) (Ramil, J., dissenting). In light of our foremost obligation to ascertain and give effect to the intent of the legislature, I disagree with the Majority's use of the bare words of HRS § 706–657 to contravene the clear intent of the legislature.

## III. *DISCUSSION*

### A. *The Intent of the Legislature in HRS § 706–657*

We have previously stated that the words of a statute are only a starting point in the construction of a statute. *See, e.g., Shipley,* 83 Hawai'i at 364–65, 926 P.2d at 1287–88. Yet, the Majority effectively concludes that the phrase "unnecessarily torturous," as used

in HRS § 706–657, is so plain and unambiguous that it justifies a departure from the legislature's clear intent. With this proposition, I cannot agree.

HRS § 706–657 provides in relevant part:

*The court may sentence a person who has been convicted of murder in the second degree to life imprisonment without possibility of parole under section 706–656 if the court finds that the murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity or that the person was previously convicted of the offense of murder in the first degree or murder in the second degree in this State or was previously convicted in another jurisdiction of an offense that would constitute murder in the first degree or murder in the second degree in this State. As used in this section, the phrase "specially heinous, atrocious, or cruel, manifesting exceptional depravity" means a conscienceless or pitiless crime which is unnecessarily torturous to a victim and "previously convicted" means a sentence imposed at the same time or a sentence previously imposed which has not been set aside, reversed, or vacated.*

(Emphases added.) In my view, a fair reading of this language indicates that the focus of HRS § 706–657 is the level of depravity exhibited by a defendant's actions as demonstrated by the surrounding circumstances of the crime.[1] I disagree that this language "clearly imposes" upon the prosecution the burden of proving beyond a reasonable doubt from a subjective stand point that the victim suffered unnecessary torture and that the defendant intentionally or knowingly inflicted unnecessary torture on the victim.

Unlike the Majority, I do not read the words "which is *unnecessarily* torturous to

---

1. The Majority attempts to ignore the legislative history of HRS § 706–657 by characterizing the statutory language as unambiguous. To arrive at its conclusion that the victim must actually suffer "unnecessary torture," the Majority reasons that "the determination of whether the murder was 'unnecessarily torturous' must be made from the perspective of the victim." However, a conscienceless or pitiless crime which is unnecessarily torturous to a victim does not necessarily mean that the victim must actually suffer unnec-

essary torture. Instead, I believe that a more reasonable interpretation of the words "a conscienceless or pitiless crime which is unnecessarily torturous to a victim" would be a crime with circumstances demonstrating exceptional depravity such that torture to the victim could be objectively inferred. In any event, inasmuch as reasonable minds may differ, the language of HRS § 706–657 is, at best, *ambiguous* as to whether the victim must actually suffer unnecessary torture.

the victim" in a vacuum.[2] By qualifying "a conscienceless or pitiless crime" with the clause "which is unnecessarily torturous to a victim," the legislature envisioned that certain circumstances of a murder would, as a matter of course, lead to the inference that the murder resulted in torture to the victim that was, *a fortiori,* unnecessary.[3] The legislature did not intend to require proof beyond a reasonable doubt that the victim, from a subjective standpoint, actually suffered torture. In other words, in determining whether a crime is "especially heinous, atrocious, or cruel, manifesting exceptional depravity[,]" the sentencing court must consider whether the circumstances of the crime were so "conscienceless or pitiless" that would allow an inference that the victim suffered "unnecessary" torture. Therefore, the

2. It does not follow that the use of the words "which is unnecessarily torturous to the victim" to modify "a conscienceless or pitiless" crime creates an additional subjective requirement of actual torture on the part of the victim. Giving full effect to the words "which is unnecessarily torturous to the victim," I read the phrase "a conscienceless or pitiless crime which is unnecessarily torturous to a victim" to mean that certain crimes that are conscienceless or pitiless may give rise to the inference that the victim suffered "unnecessary torture." Although the dissent maintains that my reading "subsumes the 'unnecessarily torturous to the victim language' into the 'conscienceless or pitiless crime' language[,]" I fail to see how the language "which is unnecessarily torturous to the victim" can create an additional *subjective* requirement that the victim actually suffer unnecessary torture. Had the legislature meant to create this additional *subjective* requirement, the legislature would have said so.

3. In my view, the word "unnecessary" as used in this context contemplates a level of torture that is beyond the level of torture inherent in all murders that may be inferred by virtue of the depraved actions of the defendant. Interestingly, although the Majority holds that "the prosecution must prove beyond a reasonable doubt that the victim suffered *unnecessary torture* [,]" the Majority fails to adequately define the word "unnecessary" as used in this context or to explain the difference between "unnecessary torture" and torture that is necessary. After all, any kind of "torture" is arguably "unnecessary." It is also difficult to imagine how a depraved killing of a person would not amount to severe suffering. In any event, the fact that the term "unnecessary torture" is essentially circular illustrates

phrase "conscienceless or pitiless crime which is unnecessarily torturous to the victim" implies that the circumstances of the crime indicate that the defendant disregarded the likelihood that his or her actions would result in "unnecessary" torture to the victim and that the circumstances of the crime allow an objective inference that the victim suffered "unnecessary" torture.[4]

Indeed, the legislative history of HRS § 706–657 reveals that the legislature intended to give sentencing courts discretion to impose a life sentence without the possibility of parole where the circumstances of the crime demonstrate exceptional depravity on the part of the defendant. *See* Stand. Comm. Rep. No. 1171, in 1993 House Journal, at 1470. As the house judiciary committee observed:

one of the problems of the Majority's construction of HRS § 706–657.

4. In this regard, I agree with the Majority that "there must be a 'principled way to distinguish' those cases in which an enhanced sentence is imposed from those in which it is not." Majority at 234, 999 P.2d at 240. I further agree that

HRS § 706–657 does not expressly refer to the defendant's state of mind; it states that the murder must be a "conscienceless or pitiless crime". The question of whether the defendant felt guilt or pity, however, necessitates an inquiry as to the defendant's state of mind. In the context of an enhanced sentencing statute, a "conscienceless or pitiless crime["] indicates a requisite state of mind beyond that necessary to prove the underlying offense.

Majority at 235, 999 P.2d at 241. Therefore, as discussed above, the phrase "conscienceless or pitiless crime which is unnecessarily torturous to the victim" implies that the circumstances of the crime indicate that the defendant disregarded the likelihood that his or her actions would result in "unnecessary" torture to the victim and that the circumstances of the crime allow a reasonable inference that the victim suffered "unnecessary" torture.

I do not agree, however, that the victim must actually suffer "unnecessary torture" or that the defendant *intended* to inflict unnecessary torture. The state of mind required by HRS § 706–657 is that Defendant *recklessly disregarded* the substantial likelihood that his/her actions would result in torture to the victim. Although the Majority insists that the state of mind of the defendant with respect to the enhanced sentencing statute must be intentional or knowing, the concept of "conscienceless" contemplates that the person without a conscience is not aware (*i.e.,* does not know) of his or her depravity.

Your Committee believes the better approach is to leave the current murder in the first degree statute as is, but to give the court discretion, based upon the circumstances· of the crime, and without the necessity of limiting itself to a specific type of offense, to judge when the circumstances of the murder justify the imposition of a life sentence without parole.

*Such discretion should, your Committee believes, be limited to those situations where the circumstances demonstrate that the individual who committed the crime is exceptionally depraved, and hence should not be considered eligible for parole.*

Therefore, your Committee has amended this bill by deleting all provisions creating the categories of "aggravated murder" and "murder" and adding new language giving discretion to the judge to sentence an individual, in a second degree murder evidencing exceptional depravity, to life without parole.

*Id.* (emphasis added). Contrary to the Majority's holding that "the prosecution must prove beyond a reasonable doubt that the victim suffered unnecessary torture[,]" the legislature did not indicate that the prosecution must prove that a murder victim must undergo actual torture or suffering, or that the defendant *intended* to inflict unnecessary torture. Instead, the legislature focused *solely* on the depravity of the defendant and his or her actions in considering whether a sentencing court should exercise its discretion to impose a life sentence without parole. In other words, neither the *actual* suffering of the victim nor the defendant's intent to actually inflict unnecessary suffering is relevant except to the extent that they demonstrate depravity. Thus, the relevant factors in deciding whether to impose an enhanced sentence is the depravity of the defendant and his or her actions as demonstrated by the circumstances of the crime.

Given the language and legislative history of HRS § 706–657, it is clear that the legislature intended that sentencing courts exercise

their discretion to sentence a defendant to life without parole where the circumstances of the crime demonstrate exceptional depravity on the part of the defendant. This unmistakable legislative intent is inconsistent with the Majority's requirements that the victim actually suffer unnecessary torture and that the defendant intended to inflict unnecessary torture. Accordingly, I would hold that enhanced sentencing under HRS § 706–657 is proper where circumstances of the crime indicate that the defendant was aware of and disregarded the likelihood that his or her actions would result in "unnecessary" torture to the victim and that the circumstances of the crime allow a reasonable inference that the victim suffered "unnecessary" torture.

The circumstances surrounding the murder of Ulbrich in this case present the classic situation for imposition of an enhanced sentence under HRS § 706–657. In this case, without any provocation, Defendant attacked Ulbrich using a large construction hammer. Defendant struck the victim with both the blunt end and the claw end of the hammer. Defendant struck the victim repeatedly. As Defendant pounded Ulbrich with the hammer, Defendant grunted loudly. After each successive blow with the hammer, Defendant would pause and assess the injuries to Ulbrich. At times, Defendant used both of his hands holding the hammer and striking the victim. The sounds of the blows could be heard over twenty feet away over the noise of a car's radio and engine. Defendant's hammering of Ulbrich's head caused Ulbrich's skull to fracture like a "cracked walnut." Under these circumstances, regardless of whether the prosecution could prove that Ulbrich subjectively suffered "unnecessary torture," I cannot say that the circuit court erred in finding that the crime was "especially heinous, atrocious, or cruel, manifesting exceptional depravity." Indeed, Defendant's actions constituted "a conscienceless or pitiless crime" that could only have resulted in "unnecessary" torture to Ulbrich.[5] I there-

5. Given the circumstances of the crime, I cannot agree with the Majority that the record does not support a finding that Ulbrich suffered "unnecessary torture." The ambulance arrived at 7:10 a.m. Ulbrich was admitted to the Queen's Medi-

cal Center Emergency Room at approximately 7:29 a.m. Ulbrich was not pronounced dead until 9:19 a.m. Although I do not mean to suggest that Ulbrich was undoubtedly conscious during these two hours, the fact finder could have reasonably

fore disagree that the circuit court, as the trier of fact in this case, was clearly erroneous in finding that the murder was "especially heinous, atrocious, or cruel."

## B. *The Absurd Results of the Majority's Interpretation*

In my view, the Majority's judicially created requirements of proof beyond a reasonable doubt that a murder victim actually suffered "unnecessary torture" and that the defendant intended to inflict "unnecessary torture" leads to absurd results. Inasmuch as a murder victim is, by definition, deceased, it is unclear what type of evidence would support an enhanced sentence under HRS § 706–657. Without exception, the victim of a murder will not be able to testify as to the degree of torture he or she suffered. The prosecution must therefore rely on circumstantial evidence to prove the victim's subjective suffering and the defendant's subjective intent to inflict unnecessary suffering. In cases where there are no eye-witnesses to hear or observe indications of suffering by the victim (*e.g.*, screams), the prosecution may find it nearly impossible to prove that the victim suffered torture. Although the prosecution could conceivably rely on expert testimony with respect to the probability and extent to which a murder victim suffered torture, the uncontroverted testimony in this case that Ulbrich's skull was "like a cracked walnut" and that the time elapsed between the attack and the time of death exceeded two hours is, according to the Majority, insufficient to support a finding that Ulbrich suffered "unnecessary torture."

By vacating the enhanced sentence in this case, the Majority allows defendants who have committed murder in which there may be difficulty in obtaining evidence of "unnec-

essary torture" to escape an enhanced sentence under HRS § 706–657 no matter how heinous or depraved the circumstances of the murder may be. Unlike the Majority, I believe that HRS § 706–657 must be applied in a way that addresses the actions of a defendant in committing the murder as opposed to the degree of suffering by a victim. By judicially imposing a new requirement that the prosecution prove beyond a reasonable doubt that the victim suffered unnecessary torture, the Majority effectively frustrates the intent of the legislature and ignores our proper role of interpreting statutes to give effect to the intent of the legislature. *See Kim*, 88 Hawai'i at 270, 965 P.2d at 812 (noting that, because legislature is presumed not to intend an absurd result, we will construe a statute to avoid inconsistency, contradiction, and illogicality).

Therefore, I cannot agree with the Majority's construction of the words "which is unnecessarily torturous to a victim" in a vacuum. Instead, in deciding whether to impose a life term without the possibility of parole under HRS § 706–657, the circuit court must focus on the depravity of the defendant's actions and the heinous nature of the circumstances of the murder. Specifically, I believe a life sentence without the possibility of parole is proper where circumstances of the crime indicate that defendant disregards the likelihood that his or her actions would result in torture to the victim and where the circumstances of the crime allow a reasonable inference that the victim suffered torture. Because the Majority's strict construction of the bare words of HRS § 706–657 leads to an absurd result, I disagree with the Majority's conclusion that this court must adhere to the plain meaning of the language used in HRS § 706–657.

---

concluded that Ulbrich suffered some sort of torture at some point during this period even given Dr. Keep's testimony. In any event, I do not agree that HRS § 706–657 requires proof beyond a reasonable doubt that the victim suffer "unnecessary torture." Under the circum-

stances of the instant case, I believe that Defendant disregarded the likelihood that his or her actions would result in torture to Ulbrich and that the circumstances of the crime allow a reasonable inference that Ulbrich suffered "unnecessary" torture.

## IV. *CONCLUSION*

Accordingly, because the Majority's opinion construes HRS § 706–657 without regard to the clear legislative intent underlying this section in derogation of our foremost obligation to give effect to the intent of the legislature, I respectfully dissent from sections III.C.2 and III.C.3 of the Majority Opinion.